577 S.E.2d 445

The STATE, Respondent,

v.

Jeffrey Thomas HASELDEN, Appellant.

No. 25595.

Supreme Court of South Carolina.

Heard Dec. 5, 2002.

Decided Feb. 18, 2003.

Assistant Appellate Defender Robert M. Dudek, of S.C. Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for Respondent.

Justice WALLER:

Appellant, Jeffrey Haselden, was convicted of the murder of his two-year old son, Joshua.[1] The jury found the aggravating circumstances that the murder was committed while in the commission of physical torture, and that the murder was of a child under eleven years of age; it recommended a sentence of death. We affirm the murder conviction, but reverse and remand for a new sentencing proceeding.

## FACTS

Shortly after midnight on Thursday, May 13, 1999, Haselden's girlfriend, Rebecca Tindall, called 9–1–1 in Lexington County to report that she had found two-year old Joshua Haselden on the floor of his bedroom not breathing. When paramedics arrived, they found Tindall administering CPR on Joshua. Haselden advised paramedics they had checked on Joshua twenty minutes prior to calling 9–1–1 and he had been fine. Joshua had noticeable swelling and bruising throughout his abdomen, from the waistline to the ribcage. Joshua was

---

1. Haselden was divorced and had custody of his two children, Felicia and Joshua.

taken to the hospital where he was pronounced dead at 1:40 AM.

At trial, Tindall testified she had just finished giving Joshua his bath and putting him to bed when Haselden arrived home from running an errand for her. She heard Haselden yell at Joshua to "get his ass back to bed." She and Haselden then went to Joshua's room to check on him as he had a habit of sticking things up his nose. They retrieved a foreign object from his nose, after which Haselden hit Joshua in the head four or five times. "Haselden had a golf ball on his key chain and he hit him in the top of the head with it. Then [Haselden] pulled [Joshua] up and was shaking him and then he pushed him at me and told me to put him to bed and not to kiss him good night either." Sometime around 11:00 PM, she went to put some laundry in the dryer. She heard Haselden yell "Goddammit Josh," and heard a noise like a thud. She went into Josh's room and saw Haselden swinging his arm hitting Josh hard in the stomach area three or four times and hollering, "Do you hear me boy, do you hear me?" She grabbed Haselden's shirt and told him that was enough. Haselden told her he'd punish his son the way he wanted to, and pushed her, causing her to stumble and fall, knocking both her and Joshua to the ground. Haselden told her to get out and she complied. A few minutes later, she went back down the hallway and saw Joshua still lying on the floor. She started to go in and pick him up, but Haselden told her Josh was fine and to leave him alone. They went back to Haselden's bedroom and had sex, after which she snuck back into Joshua's room and found him limp and began screaming for Haselden. Haselden told her to call 9–1–1.

An autopsy was performed on May 14, 1999. There was a bruise on the right side of Joshua's forehead which was consistent with being hit with a golf ball key chain. An internal examination of Joshua's scalp revealed a total of eight areas of bruising, only one of which was visible from the outside. There were a number of bruises on the lower legs, and significant bruises on the abdomen. The pathologist, Dr. Sexton, found "extensive injuries inside the abdomen." He opined the abdominal bruises were consistent with a blow from the knuckles and, in his opinion, the bruising could not have resulted from doing CPR. He concluded that there were

at least six blows to the abdomen. Further examination revealed internal bruising under the skin near the belly button, and a lot of blood in the abdominal cavity which had been caused by several areas of the intestine being separated from the mesentery (the structure that holds the intestines together). Dr. Sexton concluded there were two causes of death either of which could have been fatal; internal bleeding in the abdomen and swelling in the brain caused by the blows to the head.

The jury convicted Haselden of murder and found the aggravating circumstances that the murder was committed while in the commission of physical torture, and that the murder was of a child under eleven years of age; it recommended a sentence of death.

## ISSUES

1. Did the trial court err in allowing the testimony of Haselden's ex-wife concerning his golfing and fishing habits?

2. Was Haselden entitled to a parole ineligibility charge?

3. Were autopsy photographs of Joshua improperly admitted?

## 1. EX–WIFE'S TESTIMONY

During the guilt or innocence phase of trial, the state called Haselden's ex-wife, Robin Lucas. The two had married shortly after the birth of their daughter, Felicia, when Lucas was eighteen years old, and Haselden was twenty-four. Lucas testified that they did not have a stable marriage. Joshua was born in December 1996. The solicitor asked Lucas whether Haselden was working when Joshua was born, and Lucas replied that he "worked all the time." The solicitor continued, "If he wasn't working, what was he doing?" to which she replied, over defense counsel's objection of irrelevancy, that "he was fishing or golfing with his friends or at his mothers." She further testified that Haselden did not spend much time with her or Joshua.

 Haselden argues his ex-wife's testimony concerning his golfing and fishing habits constituted an improper attack on his character. We disagree.

Initially, Haselden did not object to this testimony on the grounds that it was improper character evidence below. He objected only on the basis of relevancy. Accordingly, this issue is not preserved for review. *State v. Byram*, 326 S.C. 107, 485 S.E.2d 360 (1997) (defendant may not argue one ground below and another on appeal). In any event, Haselden has not demonstrated reversible error.

 Character evidence is not admissible to prove the accused possesses a criminal character or has a propensity to commit the crime with which he is charged. Rule 404(a), SCRE, states the general rule that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." *State v. Brown*, 344 S.C. 70, 543 S.E.2d 552 (2001). Evidence Haselden had a tendency to golf, fish, or go to his mother's house is simply not evidence which would tend to prove he had a tendency toward abusing and murdering his two-year old son. *Brown, supra* (whatever negative connotation appellant's gambling may have had, it did not imply any propensity on his part to commit the violent crime with which he was charged, such that any error in its admission was harmless beyond a reasonable doubt).

 In any event, even assuming this evidence was objectionable, this Court has held that where there is other properly admitted evidence of conduct demonstrating the particular character trait in question, there is no reversible error. *State v. Cheeseboro*, 346 S.C. 526, 552 S.E.2d 300 (2001). Whether an error in the admission of evidence is harmless generally depends upon its materiality in relation to the case as a whole. *State v. Reeves*, 301 S.C. 191, 391 S.E.2d 241 (1990). The erroneous admission of character evidence is harmless beyond a reasonable doubt if its impact is minimal in the context of the entire record. *State v. Forney*, 321 S.C. 353, 468 S.E.2d 641 (1996).

· Here, Haselden's girlfriend Tindall was questioned as to how she began dating Haselden. She explained that she began as a babysitter for the children. The solicitor asked

where Haselden would be when she was babysitting, to which she responded, "he would either be playing golf or working." Further, Haselden admitted on cross-examination that he played a lot of golf. *State v. Schumpert,* 312 S.C. 502, 435 S.E.2d 859 (1993) (any error in admission of evidence cumulative to other unobjected-to evidence is harmless); *State v. Johnson,* 298 S.C. 496, 499, 381 S.E.2d 732, 733 (1989) (admission of improper evidence is harmless where it is merely cumulative to other evidence). We find any error in admission of this evidence was clearly harmless beyond a reasonable doubt.

## 2. PAROLE INELIGIBILITY CHARGE

Haselden next asserts the trial court erred, at sentencing, in refusing to instruct the jury that if sentenced to life imprisonment, he would be ineligible for parole. We agree.

At trial, Haselden requested a parole ineligibility charge pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In *Simmons,* the United States Supreme Court held that where the evidence raises an issue of future dangerousness, due process requires the jury be instructed of a defendant's parole ineligibility. The trial court refused the request. Haselden's sentencing phase took place approximately one month prior to the United States Supreme Court's opinion in *Shafer v. South Carolina,* 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001)(remanding to this Court for a determination whether the evidence and argument raised the issue of future dangerousness). Haselden moved for a new sentencing hearing under *Shafer,* contending the state had placed his future dangerousness at issue. The trial court denied the motion. Thereafter, the United States Supreme Court decided *Kelly v. South Carolina,* 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), which, as we recently recognized in *State v. Shafer,* 352 S.C. 191, 573 S.E.2d 796 (2002), expanded the law of what evidence or argument raises future dangerousness. Haselden contends he was entitled to a parole ineligibility instruction under *Kelly, Shafer,* and *Simmons.* We agree.

In *Kelly,* the United States Supreme Court stated "[a] jury hearing evidence of a defendant's demonstrated propensity for

violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee." 534 U.S. at 253–54, 122 S.Ct. at 731. The *Kelly* Court went on to state that "evidence of dangerous 'character' may show 'characteristic' future dangerousness ... [e]vidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." 534 U.S. at 254, 122 S.Ct. at 732. The Court then analyzed the specifics of the prosecution's argument in that case, to wit: (1) the prosecution expressed its hope the jurors would "never in [their] lives again have to experience ... [b]eing some thirty feet away from such a person;" (2) the prosecution characterized Kelly as a dangerous bloody butcher; (3) the prosecution stated Kelly was "more frightening than a serial killer" and that "murderers will be murderers." The Court found that "Kelly's jury, like its predecessor in *Simmons*, [was] invited to infer 'that petitioner is a vicious predator who would pose a continuing threat to the community.'" 534 U.S. at 256, 122 S.Ct. at 732–33.

Here, although the state did not directly argue Haselden's future dangerousness, it is patent that the evidence presented and argument thereon placed Haselden's future dangerousness in issue. As in *Kelly*, the solicitor here argued that he hoped the jury would never in its lives be thirty feet away from a baby-killer. The solicitor compared Haselden to a Dr. Jekyll and Mr. Hyde, and called him the "evil Mr. Haselden." The solicitor also referred to the Night Stalker Special Task Forces Unit Haselden was in while in the army, and its motto, "Death waits in the dark." During penalty phase, a correctional officer from Lee County Correctional Institute testified that while in county safekeeping awaiting trial, there was an incident in which Haselden had to be restrained with pepper spray. Further, during the guilt phase of trial, the state elicited testimony from Haselden's girlfriend, Becky Tindall, that immediately after Joshua's death, Haselden had threatened her babies, saying "it would be ashamed [sic] if something happened to one of your babies, wouldn't it Becky," and

that he had told her he had ways of eliminating people, having been in special forces.

The above evidence clearly raises inferences of future dangerousness, placing Haselden within the ambit of *Kelly*. Accordingly, he was entitled to a jury instruction that, if sentenced to life imprisonment, he would be ineligible for parole. Accordingly, we reverse and remand for a new sentencing proceeding.

## 3. GRUESOME AUTOPSY PHOTOS

Finally, Haselden asserts the trial court erroneously admitted several autopsy photographs (Exhibits 23–26, 29, and 31–33) of Joshua. In particular, he objects to Exhibit 29, an enlarged photo of Joshua's anus. Although we find the remaining photos were properly admitted, we agree with Haselden that exhibit 29 was irrelevant to any issue at sentencing. Accordingly, we hold that it may not be admitted at resentencing.

The relevance, materiality and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion. *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997). The purpose of the sentencing phase in a capital trial is to "direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender." *State v. Matthews*, 296 S.C. 379, 390, 373 S.E.2d 587, 594 (1988), *cert. denied*, 489 U.S. 1091, 109 S.Ct. 1559, 103 L.Ed.2d 861 (1989). Photographs may be offered as evidence in extenuation, mitigation, or aggravation. *State v. Ard*, 332 S.C. 370, 505 S.E.2d 328 (1998). In *State v. Rosemond*, 335 S.C. 593, 518 S.E.2d 588 (1999), this Court held that in the sentencing phase, the scope of the probative value of such photos is much broader than at the guilt or innocence phase. In *State v. Johnson*, 338 S.C. 114, 525 S.E.2d 519 (2000), we noted that, notwithstanding the sometime gory nature of autopsy photographs, they are nonetheless admissible where

they reveal the true nature of the attack, and allow the jury to determine the existence of physical torture. 338 S.C. at 129–130, 525 S.E.2d at 527. Further, there is no abuse of discretion if the offered photograph serves to corroborate testimony. *Id.*

The majority of the challenged photographs were necessary to corroborate the pathologist's testimony, to understand the true nature of the attack on Joshua, and were relevant to demonstrate the aggravating circumstance of physical torture.

Exhibits 23 and 24 are photographs of the left and right side of Joshua's head. The pathologist testified that he had to dissect from ear to ear and "reflect the scalp forward" to be able to see the large areas of bruising which could not be seen from outside. Exhibit 25 is a photo of the back of Joshua's head, and more clearly reveals the extent of the bruising. Exhibit 26 is a photo of Joshua's brain from the top of the head. Dr. Sexton testified that the color of the brain, and the lack of blood on top was significant as it demonstrated that the brain had swollen so much that it had actually pressed the blood out and decreased the function of the brain.

Exhibits 31, 32, and 33 are photos of Joshua's abdominal area. Exhibit 31 shows bruising under the skin in the abdominal muscles, and bruises to the soft tissue area. Exhibit 31 demonstrates the hemorrhage in the soft tissue in the fatty layer. Exhibit 32 shows blood inside the abdomen. Sexton testified that all of the blood inside the abdomen contributed to the cause of death by loss of blood and that the blood had come from tears in the messentry (which holds the intestines in) which had been torn or separated due to the force of the blows. Exhibit 33 is a photo of the intestine, after it had been removed from Joshua, and demonstrates the bruising and areas of the intestine which had separated from the messentry. Sexton also testified that Joshua would have most probably been in pain both from the head injuries and the abdominal injuries.

We find the above photos were properly admitted for the purposes of demonstrating the extent of bruising which was not visible from an external review, and they served to corrob-

orate the pathologist's testimony, as well as to prove the existence of the aggravating circumstance of physical torture. Accordingly, the trial court did not abuse its discretion in admitting these photos.

However, as to Exhibit # 29, the photo of Joshua's dilated anus, we find no legitimate purpose for its admission at the sentencing phase of trial.

At guilt phase, Dr. Sexton noted that Joshua's anus was dilated to the extent that he could put three fingers in the anus, which was abnormal, but he found no indication of any anal injury, and nothing to indicate any sexual assault.[2] He testified that it was not uncommon for the anus to relax and open post-mortem. During his guilt phase closing argument, the solicitor explained Sexton's testimony, noting that Sexton opined you cannot really tell precisely when somebody died from taking a rectal temperature. "One reason you can't tell is because Josh's rectum, two years old, easily accepts three fingers, easily accepts three fingers. I know some of ya'll have children. I don't remember which ones in particular. I know y'all have seen a rectal thermometer. And I know y'all know that a rectal thermometer is not as big around as three fingers. Sexton told you what that was all about."

At sentencing, the state introduced the photo of Joshua's anus, and again asked Sexton, "Joshua's anus easily accepted three fingers, is that correct?" Haselden's relevancy objection was overruled. On cross-exam, Sexton reiterated that there was no trauma to the anus that he could see, and that rectal dilation was not unusual after death.

Haselden argues Exhibit 29 was simply irrelevant to any issues before the sentencing phase jury and served only to inflame the jury and leave them with the impression that, perhaps, Joshua had been sexually abused. We agree.

---

2. The reason for this line of inquiry, at guilt phase, had to do with the precise time of Joshua's death. Dr. Sexton testified that Joshua's rectal temperature in the emergency room was 87 degrees. The defense was attempting to demonstrate that this body temperature indicated that Joshua had been dead for quite some time, thereby making it less probable that Haselden was the perpetrator of the injuries.

Exhibit 29 did not go to the circumstances of the crime, the characteristics of the defendant, nor to the existence of aggravating circumstances. The sole purpose of the photo was to insinuate that perhaps there was sexual abuse when, in fact, there was absolutely no evidence of such an assault. We find the extremely prejudicial nature of this photograph clearly outweighs any probative value; accordingly, Exhibit 29 may not be admitted at resentencing.

Haselden's murder conviction is affirmed; the case is remanded for a new sentencing proceeding.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.