669 S.E.2d 598

**The STATE, Respondent,**

v.

**Mark A. MARTUCCI, Appellant.**

**No. 4438.**

Court of Appeals of South Carolina.

Heard Sept. 16, 2008.

Decided Sept. 24, 2008.

Rehearing Denied Dec. 19, 2008.

---

3. We decide this case without oral arguments pursuant to Rule 215, SCACR.

Appellate Defender Elizabeth A. Franklin, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Respondent.

ANDERSON, J.:

Mark A. Martucci (Martucci) appeals his conviction for homicide by child abuse. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Martucci lived with Brandi Holder (Holder) and her two-year old son (Child) in July 2002. Child died on Wednesday, July 17, 2002. Martucci and Holder were indicted for homicide by child abuse under Section 16–3–85 of the South Carolina Code. Martucci did not appear for trial and was tried in his absence February 6–9, 2006. The jury convicted Martucci, and his sentence was sealed. On March 6, 2006, Martucci appeared in court and was sentenced to life in prison.

*A priori*, the Court embarks on a juridical journey encapsulating a temporal and spatial analysis of the evidentiary record. Nurse Ladye Kelly testified that Martucci and John Parker (Parker) brought Child to the emergency room of Allen–Bennett Hospital. Kelly declared Child appeared lifeless. He "had multiple bruises over most of his body." She described "a very odd pattern" of marks on his face which appeared to be knuckle prints. She stated Child "had multiple bruises on his legs, on his arms. His eyes were blackened. He also had a place around his mouth that was scratches or abrasions . . . and had a lot of bruising." Child had "a purple black mark that . . . covered most of his back." Kelly substantiated the bruises "were all in different stages of healing. Some of them were very fresh looking dark-purplish blue colors. Others were yellow, barely noticeable that had healed and were in between those two things. Some were darker than others. Some were lighter than others." She recalled that Child's abdomen was "very swollen." He was "very pale. He was blue around the mouth," which showed he had not been breathing.

Kelly assisted emergency room doctor Kevin Gregg in trying to revive Child, but they were unsuccessful. Dr. Gregg asserted the Child was "freshly dead. He was cooler—his temperature was cooler than 98.6, but it was warmer than room temperature." Dr. Gregg recollected that Martucci and Parker told him about a "four-wheeler ATV accident" earlier in the week. Dr. Gregg declared they told him that Child was not wearing a helmet on an ATV and "flipped or was ejected out of the ATV, so the story went. The story was that he looked okay after the injury so the family didn't feel a need to bring him to the ER to get checked." Holder and Martucci advised Dr. Gregg that Child appeared weak and had vomited several times the day before. Dr. Gregg professed Martucci claimed that he performed mouth-to-mouth resuscitation, and Child "bit him on the upper lip." Dr. Gregg annunciated this story was implausible because "that is something I've never seen before. I've never head of it before. When you do rescue breathing on somebody, they are unconscious. And an unconscious person can't bite.... I don't understand why an unconscious boy would bite somebody on the lip.... If he's conscious, he doesn't need mouth to mouth resuscitation." Dr. Gregg recalled that Martucci had an open cut on his lip, but he did not treat Martucci's injury.

Dr. Gregg opined Child's injuries were inconsistent with the kind of accident described. He explained Child "had bruises. He didn't have cuts. He didn't have abrasions. He didn't have the usual signs of wear and tear you see on a two-and-a-half-year-old boy. He didn't have skinned knees. He didn't have scraped up palms from playing or rolling or falling off the porch. He had bruises."

John Parker (Parker) asseverated that he visited Martucci and Holder's home "[f]rom time to time." He saw Martucci interact with Child. He testified without objection:

Parker: There was an incident where we were in his living room and [Child] was crying. And Mr. Martucci had told him on numerous occasions to ... He was asked—Mr. Martucci asked him—or told him on numerous occasions to stop crying. And [Child] did not do so. He then proceeded to tape his mouth shut with tape.

. . .

There were episodes where he would be in the bathroom and Mr. Martucci would be giving him a bath. I would hear [Child] crying. And I would walk in to see what he was crying about and Mark would be pouring water over his head. And [Child] would continue to keep crying. He would tell him that crying is for pussys. And he would dunk his head under water. He did that on numerous occasions.

Assistant Solicitor: When you say "dunk his head under water," was it a quick dunk?

Parker: No, ma'am. I'd say, at least, a couple of seconds at a time.

Assistant Solicitor: How was [Child] reacting to that?

Parker: He would swallow water almost like he was choking on the water. And then he would pull him up. And then no sooner—he would barely even catch his breath and he would do it again.

. . .

Assistant Solicitor: Did you witness anything else abusive?

Parker: We were in the van—no, I take that back. We were outside sometimes and then there was a couple of occasions in the inside of his house where he would be crying and Mr. Martucci would slap him in the face on both sides of his face.

Assistant Solicitor: Can you sort of demonstrate in some way what you're talking about? What kind of slap or force was used?

Parker: The only way I can describe it is the way a person would smack a dog to make them mean, back and forth.

Assistant Solicitor: That's what he did to [Child's] head?

Parker: Yes, ma'am. I've seen him grab his face like that when he wouldn't stop crying and try to tell him to be quiet.

Assistant Solicitor: Did you ever see bruises or marks on [Child]?

Parker: I did notice the bruises on his face from the way he was grabbing him. And I believe I did notice the bite on his wrist. They—it did seem that they went out of their way to make sure he kept clothes on. I very rarely seen him without clothes, except for the incidents in the bathroom.

Dr. Michael Eugene Ward, Greenville County's chief medical examiner, was called to the hospital soon after Child was pronounced dead. He declared:

On initial examination at Allen Bennett Hospital, there were numerous bruises to [Child] about the face, the chest, the back, and the extremities. There were injuries that were present around the perineum or the penis, and to one of the arms that were especially disconcerting to us. And so we took samples of them at that time.

Dr. Ward performed an autopsy on Child. Photographs of Child and his internal organs were admitted into evidence over Martucci's objection. Dr. Ward used the photographs to explain Child's injuries:

This is a photograph of the left back leg of [Child]. This is right in the crux of the leg. And, as you can see, there are these bruises and superficial abrasions of the skin running in a linear fashion across the skin. These indicating that this is a result of blunt injury.

So it's not a sharp injury that you would expect from a knife or from some sort of cutting instrument. And it's not from a penetrating injury like a gunshot wound, but it's a blunt injury where the skin is compressed and there's disruption of underlying blood vessels resulting in a bruise, as well as a superficial abrasion or a scratching of the skin.

So this is linear injuries or line-shaped contusions to the back of [Child's] leg.

Assistant Solicitor: Dr. Ward, in your experience and training, are there any particular mechanisms of inflicting such a linear bruise?

Dr. Ward: There are. There are numerous instruments that can be used that will cause a linear-type bruise. Generally, they are things that are longer than they are wide. Certain things can be—they can be cords. They can be belts or even fingers if a slap is applied in a hard enough fashion that create these linear and sort of semi-circular type bruises as with this.

. . .

This is a photograph of the perineal region of the body of [Child]. This is the abdomen here, the pelvis, the penis, and the scrotum. Here at the base of the penis is a bruise, a

sort of butterfly-shaped, if you will, bruise approximately one and a half inch in greatest dimension. There's a smaller bruise in this region here.

And right here at the base of the penis where the skin of the penis attaches to the pelvic skin, there's a superficial laceration or tear of the skin in this region. I took microscopic sections—at the time of autopsy, I took microscopic sections of the skin through this region here. It demonstrated acute hemorrhage or bleeding into the skin. But it indicated that there was no evidence of any healing. There was no inflammation. There was no granulation tissue. There was no evidence of repair to this region here or here.

Assistant Solicitor: And what did that indicate to you?

Dr. Ward: That is was a recent injury only a—no more than a few hours old. And as we will see with other injuries that there were, there was—which have evidence of healing that this act most very likely occurred at a different time than the other injuries—some other injuries. This is the result of blunt trauma. I believe that this is a blunt injury to this region here with superficial tearing of adjacent skin.

. . .

This is a photograph taken at the time of autopsy showing the intraabdominal cavity of [Child]. There were bruises on the outer surface of the skin. As we dissected beneath, there was—there were bruising beneath the skin and above the muscles of the abdomen.

When we reflected those muscles of the abdomen, we were able to demonstrate that there was over 250 milliliters of blood present in the peritoneal cavity or in the abdominal cavity. 350 milliliters is about the size of a can of Coke. So this is almost the amount of blood that's in a can of Coke or a little bit less than that.

This is the small intestine here. And this is the large intestine. As you can see, there's a space between here that should not normally be. There's a fatty ligament that normally attaches this large intestine to the underlying structures of the abdomen. This has been torn. It's been torn away from the underlying surface of the large intestine. And in this region here, there is blood that is hemor-

rhaged within the outer surface of the large intestine, as well as—

. . .

State's Exhibit No. 13, again, demonstrates the tearing of the ligament that normally attaches the large intestine to the stomach demonstrating that it has been torn away along this broad surface of the transverse colon, hemorrhage within the outer surface of the colon, as well as hemorrhage deep down in the structures of the abdomen. Within this region here, it's the head of the pancreas. There have been trauma and hemorrhage to the head of the pancreas with the soft tissue surrounding the pancreas with hemorrhage. And the interesting thing about this injury is that when I took microscopic sections from this region, it did show evidence of healing, that there were evidence—there were areas that showed not only acute hemorrhage, but there were other areas that showed hemorrhage that had been there for a period of time, several hours to a couple of days such that the body had started to react to this injury. It had started to try to repair it. And there was—there were fibrous tissues being laid down. There were new blood vessels there. There were cells that come in and try to clean up this blood. So we have two different ages of trauma here in the abdomen. We've got some that shows evidence of healing, and some that show no evidence of healing and only fresh blood.

. . .

The blunt injuries to [Child's] gastrointestinal system would, basically, cause his small and large intestine to no longer function in the way that we know it to do. The small intestine, basically, takes food, water, and other products from the stomach and allows it to pass and begin to digest on its way down to the large intestine. When you traumatize the small intestine, as [Child] had with tearing of the mucosa, then the muscles—the smooth muscles in the small intestine are no longer going to work together to move things down the system. So they're going to back up. And the most common presentation of someone with trauma to the small intestine like that and no longer moving fluids

out would be vomiting, in that anything that goes in is going to sit on the stomach and not be able to be passed down. The pressure is going to be increased. And then the person would have nausea and vomiting. Certainly, I would expect it to be, obviously fairly painful in that he may even show some guarding and not want you to touch his stomach.

Elizabeth Venesky (Venesky) lived next door to Martucci and Holder. Her husband took two pictures of her and Child while he visited their house on June 20, 2002. In the pictures, Child was not wearing a shirt. Dr. Ward discussed:

These bruises here [in Venesky's pictures] are not—although they're in the same location, they're not the same bruises that we saw at the time of autopsy. So he has bruises here at this time. He has separate and distinct bruises in virtually the same place at the time of autopsy.

## ISSUES

I. Did trial judge err in admitting autopsy photographs of Child's internal organs and other injuries?

II. Did the trial judge err in admitting evidence of prior incidents of alleged abuse of Child by Martucci in the weeks immediately preceding his death?

III. Did the trial judge err in admitting evidence of Martucci's character, specifically Parker's testimony that Martucci had a temper and had pistols in the house?

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Preslar*, 364 S.C. 466, 472, 613 S.E.2d 381, 384 (Ct.App.2005) (citing *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001); *State v. Wood*, 362 S.C. 520, 525, 608 S.E.2d 435, 438 (Ct.App.2004)); *State v. Landis*, 362 S.C. 97, 101, 606 S.E.2d 503, 505 (Ct.App.2004); *State v. Abdullah*, 357 S.C. 344, 349, 592 S.E.2d 344, 347 (Ct.App.2004). "This court is bound by the trial court's factual findings unless they are clearly erroneous." *Preslar*, 364 S.C. at 472, 613 S.E.2d at 384; *accord State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006) (citing *State v. Quattlebaum*, 338 S.C. 441, 442, 527 S.E.2d 105, 111 (2000)). The appellate court does not re-

evaluate the facts based on its own view of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829; *Preslar*, 364 S.C. at 472, 613 S.E.2d at 384; *State v. Mattison*, 352 S.C. 577, 583, 575 S.E.2d 852, 855 (Ct.App.2003).

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001); *accord State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006); *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002); *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000); *State v. Tucker*, 319 S.C. 425, 428, 462 S.E.2d 263, 265 (1995) (citing *State v. Bailey*, 276 S.C. 32, 37, 274 S.E.2d 913, 916 (1981)); *Wright v. Craft*, 372 S.C. 1, 33, 640 S.E.2d 486, 503 (Ct.App.2006); *State v. Funderburk*, 367 S.C. 236, 239, 625 S.E.2d 248, 249–250 (Ct.App.2006); *State v. Broaddus*, 361 S.C. 534, 539, 605 S.E.2d 579, 582 (Ct.App.2004). "A court's ruling on the admissibility of evidence will not be reversed by this Court absent an abuse of discretion or the commission of legal error which results in prejudice to the defendant." *State v. Hamilton*, 344 S.C. 344, 353, 543 S.E.2d 586, 591 (Ct.App. 2001), *overruled on other grounds by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005); *accord Preslar*, 364 S.C. at 472, 613 S.E.2d at 384; *State v. McLeod*, 362 S.C. 73, 79, 606 S.E.2d 215, 218–219 (Ct.App.2004); *State v. Mansfield*, 343 S.C. 66, 77, 538 S.E.2d 257, 263 (Ct.App.2000); *State v. Blassingame*, 338 S.C. 240, 251, 525 S.E.2d 535, 541 (Ct.App.1999); *State v. Patterson*, 337 S.C. 215, 228, 522 S.E.2d 845, 851 (Ct.App. 1999); *see State v. Jones*, 343 S.C. 562, 572, 541 S.E.2d 813, 818 (2001) ("The trial judge's decision to admit or exclude the evidence is reviewed on appeal under an abuse of discretion standard."); *State v. Taylor*, 333 S.C. 159, 172, 508 S.E.2d 870, 876 (1998) ("[I]n order for this Court to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown."). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *State v. Irick*, 344 S.C. 460, 463, 545 S.E.2d 282, 284 (2001) (citing *Lee v. Suess*, 318 S.C. 283, 285, 457 S.E.2d 344, 346 (1995)); *accord State v. Sweet*, 374 S.C. 1, 5, 647 S.E.2d

202, 204–205 (2007); *State v. Adkins,* 353 S.C. 312, 326, 577 S.E.2d 460, 468 (Ct.App.2003).

"To show prejudice, there must be a reasonable probability that the jury's verdict was influenced by the challenged evidence or the lack thereof." *White,* 372 S.C. at 374, 642 S.E.2d at 611 (citing *Fields v. Reg'l Med. Ctr. Orangeburg,* 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005)); *accord Vaught v. A.O. Hardee & Sons, Inc.,* 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005). "Error is harmless when it 'could not reasonably have affected the result of the trial.'" *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (quoting *State v. Key,* 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971)); *accord State v. Sherard,* 303 S.C. 172, 175, 399 S.E.2d 595, 596 (1991); *Broaddus,* 361 S.C. at 542, 605 S.E.2d at 583; *State v. Adams,* 354 S.C. 361, 380, 580 S.E.2d 785, 795 (Ct.App.2003); *see also Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[S]ome constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."); *State v. Rice,* 375 S.C. 302, 316, 652 S.E.2d 409. 375 S.C. 302, 652 S.E.2d 409, 415 (Ct.App.2007) ("The commission of legal error is harmless if it does not result in prejudice to the defendant."); *Visual Graphics Leasing Corp., Inc. v. Lucia,* 311 S.C. 484, 489, 429 S.E.2d 839, 841 (Ct.App. 1993) ("An error is not reversible unless it is material and prejudicial to the substantial rights of the appellant."). "When guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached, [an appellate] court should not set aside a conviction because of errors not affecting the results." *Broaddus,* 361 S.C. at 542, 605 S.E.2d at 583 (citing *Hill v. State,* 350 S.C. 465, 472, 567 S.E.2d 847, 851 (2002)).

## *LAW/ANALYSIS*

The Legislature has criminalized homicide by child abuse: (A) A person is guilty of homicide by child abuse if the person:

(1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death

occurs under circumstances manifesting an extreme indifference to human life; or

(2) knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven.

(B) For purposes of this section, the following definitions apply:

(1) "child abuse or neglect" means an act or omission by any person which causes harm to the child's physical health or welfare;

(2) "harm" to a child's health or welfare occurs when a person:

(a) inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment;

(b) fails to supply the child with adequate food, clothing, shelter, or health care, and the failure to do so causes a physical injury or condition resulting in death; or

(c) abandons the child resulting in the child's death.

S.C.Code Ann. § 16–3–85 (2003).

## I. AUTOPSY PHOTOGRAPHS OF CHILD

Martucci asserts the trial judge committed reversible error in admitting autopsy photographs of Child's internal organs and other injuries. We disagree.

The State has the right to prove every element of the crime charged and is not obligated to rely upon a defendant's stipulation. *State v. Johnson,* 338 S.C. 114, 122, 525 S.E.2d 519, 523 (2000). The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion. *State v. Haselden,* 353 S.C. 190, 199, 577 S.E.2d 445, 450 (2003); *State v. Rosemond,* 335 S.C. 593, 596, 518 S.E.2d 588, 589–90 (1999); *see also State v. Kelley,* 319 S.C. 173, 177, 460 S.E.2d 368, 370 (1995) (stating that trial judge has considerable latitude in ruling on admissibility of evidence and his rulings will not be disturbed absent showing of probable prejudice). The trial judge must balance the prejudicial effect of graphic photographs against their probative value. *State v. Vang,* 353 S.C. 78, 87, 577 S.E.2d

225, 229 (Ct.App.2003). A trial judge's decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances. *State v. Hamilton,* 344 S.C. at 357, 543 S.E.2d at 593. Admitting photographs which serve to corroborate testimony is not an abuse of discretion. *Rosemond,* 335 S.C. at 597, 518 S.E.2d at 590; *see State v. Tucker,* 324 S.C. 155, 478 S.E.2d 260 (1996); *State v. Jarrell,* 350 S.C. 90, 564 S.E.2d 362 (Ct.App. 2002). However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions. *State v. Brazell,* 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997). "To constitute unfair prejudice, the photographs must create a 'tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Kelley,* 319 S.C. at 178, 460 S.E.2d at 370–71 (quoting *State v. Alexander,* 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991)). A trial judge is not required to exclude relevant evidence merely because it is unpleasant or offensive. *Davis v. Traylor,* 340 S.C. 150, 530 S.E.2d 385, 387 (Ct.App.2000).

■ In the present case, the photographs were introduced to corroborate the testimony of Dr. Ward, who testified regarding the various injuries inflicted on Child, including the discoloration of the bruises and the internal trauma which caused his death. The photographs were relevant to prove Child was abused, that the abuse was the cause of his death, and that the abuse manifested an extreme indifference to human life, all of which support the charge of homicide by child abuse. *See* S.C.Code Ann § 16–3–85(A)(1) (2003). Furthermore, the photographs were necessary to depict the severity of the bruises and the resulting trauma, which was inconsistent with accidental injury or play. The photographs were relevant and necessary, and they were not introduced with the intent to inflame, elicit the sympathy of, or prejudice the jury. The trial judge did not abuse his discretion in admitting the photographs. *See Jarrell,* 350 S.C. at 106, 564 S.E.2d at 371 (upholding the admission of graphic autopsy photographs in homicide by child abuse case because they corroborated testimony and demonstrated the extent of the injuries); *see also State v. Nichols,* 325 S.C. 111, 121, 481 S.E.2d 118, 124 (1997) (admitting a photograph of the victim's face because it demon-

strated the angle and distance from which the victim was shot); *State v. Nance,* 320 S.C. 501, 508 466 S.E.2d 349, 353 (1996) (holding trial court did not err in admitting photographs during trial which (1) corroborated testimony regarding the various places in which the victim was stabbed; (2) corroborated testimony indicating the likelihood the victim died of the stab wounds; (3) were used to show malice, an element of the crime charged; and (4) were later reviewed by the supreme court and found not to be unduly prejudicial to the defendant).

## II. EVIDENCE OF PRIOR INCIDENTS OF ALLEGED ABUSE OF CHILD

Martucci argues the judge committed reversible error in admitting (1) Parker's testimony alleging prior incidents where Martucci abused Child and (2) photographs taken by Elizabeth Venesky showing external bruising to Child several weeks before his death. We disagree.

The trial judge has considerable latitude in ruling on the admissibility of evidence and his decision should not be disturbed absent prejudicial abuse of discretion. *Brazell,* 325 S.C. at 78, 480 S.E.2d at 72. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina." Rule 402, SCRE. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE; *State v. Aleksey,* 343 S.C. 20, 35, 538 S.E.2d 248, 256 (2000). The determination of prejudice must be based on the entire record, and the result will generally turn on the facts of each case. *State v. Brooks,* 341 S.C. 57, 62, 533 S.E.2d 325, 328 (2000). Evidence is unfairly prejudicial if it has an undue tendency to suggest decision on an improper basis, such as an emotional one. *Saltz,* 346 S.C. at 127, 551 S.E.2d at 247.

South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's

guilt for the crime charged, except to establish: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or (5) the identity of the perpetrator. *State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999); *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923); *State v. Sweat*, 362 S.C. 117, 123, 606 S.E.2d 508, 511 (Ct.App.2004). If not the subject of a conviction, proof of prior bad acts must be clear and convincing. *State v. Weaverling*, 337 S.C. 460, 468, 523 S.E.2d 787, 791 (Ct.App.1999). When considering whether there is clear and convincing evidence, this court is bound by the trial judge's findings unless they are clearly erroneous. *State v. Tutton*, 354 S.C. 319, 325, 580 S.E.2d 186, 189 (Ct.App. 2003). The record must support a logical relevance between the prior bad act and the crime for which the defendant is accused. *Id.* at 329, 580 S.E.2d at 192. Even though the evidence is clear and convincing, and falls within a *Lyle* exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* at 324, 580 S.E.2d 186, 580 S.E.2d at 189. If there is any evidence to support the admission of bad act evidence, the trial judge's ruling cannot be disturbed on appeal. *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829.

### a. Intent/Absence of Mistake or Accident

In a prosecution for homicide by child abuse, "extreme indifference" is in the nature of "a culpable mental state . . . and therefore is akin to intent." *Jarrell*, 350 S.C. at 98, 564 S.E.2d at 366; *see also State v. McKnight*, 352 S.C. 635, 644, 576 S.E.2d 168, 172–73 (2003).

The prior abuse or neglect at issue was admissible as proof of intent and the absence of accident. The State contended Martucci killed Child while committing child abuse or neglect under circumstances manifesting an extreme indifference to human life. The prior abuse or neglect at issue in the weeks before the infliction of the fatal injuries was relevant to the material issue of Martucci's state of mind. Martucci's hostility, cruelty, and abuse toward Child could be established by evidence that, during the weeks before he died, Martucci abused Child by slapping his face, taping his mouth shut, and

dunking his head in the bathtub until he choked to stop him from crying. The presence of bite marks and bruises, and the fact that Martucci kept Child's skin covered and rarely let him out of the house in the apparent attempt to conceal the abuse, is further evidence of Martucci's state of mind to inflict the fatal injuries. Because Martucci disputed the motive and intent to commit homicide by child abuse, evidence of the prior abuse or neglect was highly probative of his guilt on the homicide charge. The evidence was necessary to establish a material fact or element of the crime charged. *See State v. Smith,* 337 S.C. 27, 522 S.E.2d 598 (1999) (defendant's prior criminal domestic violence conviction admissible to establish his intent to kill and the absence of mistake or accident); *State v. Sweat,* 362 S.C. 117, 606 S.E.2d 508 (Ct.App.2004) (evidence of a prior episode of domestic violence was admissible in prosecution for first-degree burglary, assault and battery with intent to kill, and assault of a high and aggravated nature; to show defendant's motive, that defendant was driven by anger over ex-girlfriend causing him to go to jail and terminating their relationship, and that he intended to "get his property"; and intent, that defendant maliciously sought to inflict harm upon ex-girlfriend and her new boyfriend).

Chief Justice Toal recently articulated the difficulty the State faces in proving child abuse:

> Child abuse differs from other types of crimes in several respects. Specifically, the crime of child abuse often occurs in secret, typically in the privacy of one's home. The abusive conduct is not usually confined to a single instance, but rather is a systematic pattern of violence progressively escalating and worsening over time. Child victims are often completely dependent upon the abuser, unable to defend themselves, and often too young to alert anyone to their horrendous plight or ask for help. It is also not uncommon for child abuse victims to be so young that they are incapable of offering testimony against the abuser. For these reasons, proving the crime of child abuse is extremely difficult.

*State v. Fletcher,* 379 S.C. 17, 27, 664 S.E.2d 480, 485 (2008) (Toal, C.J., dissenting).

When a child is brought to an emergency room with injuries in various stages of healing, there is evidence of recurring child abuse. If the multiple, separately occurring injuries are not admissible in child abuse prosecutions, the crime would be virtually impossible to prove. Martucci and Holder both informed hospital personnel and police that Child was injured in a four-wheeler accident and that he frequently fell. The prior abuse or neglect at issue was so close in time to the infliction of the fatal injuries that the evidence was relevant and probative to refute their claims and demonstrate Martucci intended to hurt Child. The prior evidence was logically relevant to Martucci's intent and absence of mistake or accident at the time of Child's death.

### b. Identity

Martucci advances he did not abuse Child; instead, he said "she" did it. On the other hand, Holder eventually told police that "he" abused Child and admitted she did nothing to stop it. In order to identify Martucci as the likely perpetrator of Child's injuries, the prior abuse or neglect at issue was relevant to establish his identity as the person or one of the persons who fatally abused Child. *See State v. Forney*, 321 S.C. 353, 468 S.E.2d 641 (1996) (finding evidence that defendant was the gunman during a robbery was relevant to establish it was the defendant who actually killed the victim); *State v. Good*, 315 S.C. 135, 432 S.E.2d 463 (1993) (evidence that defendant robbed grandmother's home four months earlier and the theft of items belonging to her were admissible to establish identity of her killer). The fact that Martucci exhibited such cruelty and abuse toward Child within a relatively short period of time prior to his death circumstantially identified him as Child's killer. *See State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007).

### c. Common Scheme or Plan

The evidence at issue established a pattern of continuous abuse or neglect necessary to prove homicide by child abuse and clearly supported the existence of a common scheme or plan, which made it more probable Child was a victim of "child abuse or neglect." The prior abuse or neglect at issue is highly relevant to Martucci's common scheme or

plan rather than his character. The evidence showed Martucci followed a pattern of continuous conduct over a period of time from June to Child's death on July 17, making its logical relevance apparent and the evidence admissible. *See Tutton,* 354 S.C. at 329, 580 S.E.2d at 192.

In the case of the common scheme or plan exception, a close degree of similarity between the prior bad act and the crime for which the defendant is on trial is necessary. *State v. Hough,* 325 S.C. 88, 95, 480 S.E.2d 77, 80 (1997). Prior bad act evidence is admissible where the evidence is of such a close similarity to the charged offense that the previous act enhances the probative value of the evidence so as to outweigh the prejudicial effect. *State v. Raffaldt,* 318 S.C. 110, 114, 456 S.E.2d 390, 392 (1995). The degree of remoteness between the other crimes and the one charged is one factor to be considered in determining the connection between them. *Id.* As the similarity becomes closer, the more likely the evidence will be admissible. *State v. Aiken,* 322 S.C. 177, 180, 470 S.E.2d 404, 406 (Ct.App.1996). "The acid test of admissibility is the logical relevancy of the other crimes." *State v. Cutro,* 332 S.C. 100, 103, 504 S.E.2d 324, 325 (1998).

When a criminal defendant's prior bad acts are directed toward the same victim and are very similar in nature, those acts are admissible as a common scheme or plan. *State v. Weaverling,* 337 S.C. at 471, 523 S.E.2d at 792–93. In *Weaverling,* the defendant repeatedly raped the same child. *Id.* This Court held the defendant's prior acts were admissible even though the acts were not charged. *Id.* at 469, 523 S.E.2d at 791. This Court articulated that "[w]here the evidence is of such a close similarity to the charged offense that the previous act enhances the probative value of the evidence so as to overrule the prejudicial effect, it is admissible." *Id.* (citing *Raffaldt,* 318 S.C. 110, 456 S.E.2d 390).

The present case is distinguishable from *State v. Pierce,* 326 S.C. 176, 485 S.E.2d 913 (1997). In *Pierce,* testimony of the defendant's fellow employee about the defendant's rough treatment of the child one year prior to his death was held to be inadmissible under the common scheme or plan exception because there was no connection between the prior bad act and the crime of homicide by child abuse. However, as with

cases of sexual abuse, child abuse generally involves the same perpetrator committing abuse against the same helpless victim. And where, as here, the perpetrator is the parent or a person with exclusive custody and control over the victim, proving the abuse becomes extremely difficult.

As a result of the difficulties in proving child abuse, "evidence which shows a pattern of abuse becomes even more probative than it might otherwise be." *Pierce*, 326 S.C. at 182, 485 S.E.2d at 916 (citing *State v. McClellan*, 283 S.C. 389, 323 S.E.2d 772 (1984)) (Burnett, J., dissenting). Justice Burnett further elaborated: "[c]ontinued illicit intercourse is analogous to a pattern of child abuse, and the only difference between [child abuse] and *McClellan* is that this case involved child abuse, not sex abuse." *Id.*

*Pierce* can be reconciled with this case. In *Pierce*, the prior abuse occurred one year before the child's death. The prior abuse or neglect at issue in the case *sub judice* occurred about a month and a half up to a few weeks before Child's death. The evidence of prior abuse against the same victim was not remotely disconnected in time from the conduct giving rise to the homicide by child abuse and was part of the same pattern of abuse showing extreme indifference to human life. It was logically relevant to proving Child died of multiple, non-accidental blunt force injuries and that his death was the result of child abuse. There should be no distinction between continued illicit intercourse by the same perpetrator against the same victim and continued child abuse by the same perpetrator against the same victim. The State had the burden of proving that Martucci's conduct caused Child's death. Because the prior abuse or neglect was probative of a pattern of abuse by Martucci against Child, it was admissible under the "common scheme or plan" exception to *Lyle*.

### d. Clear and Convincing Evidence

Martucci did not argue at trial that the State failed to show the prior acts by clear and convincing evidence. The issue cannot be considered on appeal. *See State v. Luckabaugh*, 327 S.C. 495, 499, 489 S.E.2d 657, 659 (Ct.App.1997) (issue not preserved when a defendant failed to object to testimony as less than clear and convincing); *see also Nichols*, 325 S.C. 111,

481 S.E.2d 118 (an objection must be on a specific ground); *State v. Patterson,* 324 S.C. 5, 19, 482 S.E.2d 760, 767 (1997) (an appellant "is limited to the grounds raised at trial").

In any event, the photographs of Child taken by Venesky's husband were admissible. The appellate court "does not conduct a *de novo* review to determine if the evidence is clear and convincing." *State v. Cheeseboro,* 346 S.C. 526, 546, 552 S.E.2d 300, 310 (2001) (noting that court cannot re-revaluate the facts based on its own view of the preponderance of the evidence but must simply determine whether the trial judge's ruling is supported by any evidence). Here, Parker testified about his direct observations of the prior incidents. Further, other witnesses testified about the bruises and burns depicted in the photographs. Thus, there was clear and convincing evidence of the prior abuse to admit it at trial. The credibility of this evidence was for the jury, not this Court, to determine. *Id.*

### e. *Res Gestae*

Evidence of bad acts or other crimes may be admitted under the *res gestae* theory:

> One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the '*res gestae*'" or the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other . . .' [and is thus] part of the *res gestae* of the crime charged." And where evidence is admissible to provide this "full presentation" of the offense, "[t]here is no reason to fragmentize the event under inquiry" by suppressing parts of the "*res gestae.*"

*State v. Adams,* 322 S.C. 114, 122, 470 S.E.2d 366, 370–71 (1996) (quoting *United States v. Masters,* 622 F.2d 83, 86 (4th Cir.1980)). The *res gestae* theory recognizes that evidence of

other bad acts may be an integral part of the crime with which the defendant is charged or may be needed to aid the fact finder in understanding the context in which the crime occurred. *State v. Owens,* 346 S.C. 637, 552 S.E.2d 745 (2001), *overruled on other grounds by State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005); *Wood,* 362 S.C. 520, 608 S.E.2d 435; *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). Under this theory, it is important that the temporal proximity of the prior bad act be closely related to the charged crime. *Hough,* 325 S.C. 88, 480 S.E.2d 77. Even if the evidence is relevant under this theory, prior to admission the trial judge should determine whether its probative value clearly outweighs any unfair prejudice. Rule 403, SCRE; *State v. Bolden,* 303 S.C. 41, 398 S.E.2d 494 (1990).

▆▆▆ Martucci argues the prior incidents were neither factually nor temporally related to the charged crime. In this case, the time period and similarity of the incidents involved must be examined overall because of the nature of the crime charged. The overall view of the facts provides the context in which the crime occurred and demonstrates the culminating impact on Child. The incidents were relevant to establishing Martucci's state of mind and whether or not he manifested an extreme indifference to human life. The alleged child abuse occurred in the month and a half to several weeks before the fatal trauma was inflicted. The evidence was necessary to establish the crime charged. Its admission was essential and relevant to a full presentation of the evidence in this case. The testimony regarding the prior bad acts was relevant to show the complete, whole story relating to the charge of homicide by child abuse. Moreover, the probative value of the evidence outweighed its prejudicial effect. *See Owens,* 346 S.C. at 653, 552 S.E.2d at 753. The trial judge did not err in admitting the evidence of alleged prior abuse pursuant to the *res gestae* doctrine.

### III. PARKER'S TESTIMONY OF MARTUCCI'S CHARACTER

Martucci argues the trial judge committed reversible error in allowing Parker's testimony about his temper and that he had pistols in the house. He contends this evidence improperly introduced his bad character to the jury and was inadmissi-

ble under *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). We disagree.

Parker witnessed several occasions when Martucci abused Child while he stayed at the house. Parker testified that when Martucci abused Child, "it would upset me to the point to where I would have to walk outside. I couldn't listen to it anymore." On direct examination, the Assistant Solicitor asked Parker:

Assistant Solicitor: Did you ever think about trying to call for help for [Child]?

Parker: I thought about it, yes, ma'am. Me and Mr. Martucci had—we had conflicts in the past. And I knew of his temper from hanging out with him a lot—

Defense Counsel: Your Honor, I would object to any character evidence of Mr. Martucci.

The Court: I'll allow this. Go ahead.

Parker: We had—I knew of his attitude. I knew he had pistols in the house. I knew that he—we had conflicts in the past to the point—we had—there was one episode in Myrtle Beach to where me and a few friends of mine were down there as well as—

Defense Counsel: Your Honor, I hate to object—

The Court: Yes. This is getting a little bit too far now, Solicitor.

Assistant Solicitor: Your Honor, I will say that this is relevant to his state of mind and—

The Court: All right. I'm going to stop it here. I think it's gone far enough. Move on, please.

Parker's direct examination continued. Parker averred he was afraid of Martucci because of prior incidents. Parker noted he was "pretty small" in comparison to Martucci. Parker said he did not get help because, "I was afraid of him and I knew the—what could happen scared me."

■ Where a defendant objects and the objection is sustained but he does not move to strike the evidence, the issue is not preserved for appellate review. *State v. McFadden*, 318 S.C. 404, 410, 458 S.E.2d 61, 65 (Ct.App.1995) (no issue is preserved for appeal where the court sustains a party's objection to improper testimony and the party does not move to

strike the testimony); *State v. Wingo*, 304 S.C. 173, 177–78, 403 S.E.2d 322, 325 (Ct.App.1991) (a motion to strike is necessary where a question is answered before an objection has been interposed, even though the objection is sustained); *see also State v. Kelsey*, 331 S.C. 50, 75, 502 S.E.2d 63, 73, 76 (1998) (any prejudice to the defendant could have been removed if the defendant had requested the trial judge to strike the objected-to testimony and to give a curative instruction to the jury).

In the case at bar, Martucci objected to Parker's testimony about the presence of guns in the house and a prior incident in Myrtle Beach. The trial judge sustained the objection by stating, "it's gone far enough." He then instructed the Assistant Solicitor to "move on." Martucci failed to request the trial judge either strike the objectionable testimony or to instruct the jury to disregard the reference, and he did not move for a mistrial. His failure to request appropriate relief precludes appellate review of this issue. *Id.*

When Parker later testified about his fear of Martucci based on prior incidents and because he knew "what could happen to me," there was no objection. Because the jury heard this other evidence, the fact they heard the previous testimony was not prejudicial to Martucci. *See Haselden*, 353 S.C. at 196, 577 S.E.2d at 448 (stating the erroneous admission of prior bad act evidence is harmless beyond a reasonable doubt if its impact is minimal in the context of the entire record); *State v. Schumpert*, 312 S.C. 502, 507, 435 S.E.2d 859, 862 (1993) (finding any error in the admission of evidence cumulative to other unobjected-to evidence is harmless).

Parker's testimony was an isolated comment regarding Martucci's temper and his possession of pistols that did not prejudice Martucci. The State did not attempt to introduce evidence of any prior convictions or otherwise highlight his character in this regard. *See State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999) (determining law enforcement agent's isolated testimony that he compared defendant's fingerprints with a fingerprint card agency had on record was not so prejudicial to defendant as to warrant a mistrial because it was questionable whether jury drew connection between fingerprint card and defendant's prior criminal activity); *State v. George*, 323

S.C. 496, 476 S.E.2d 903 (1996) (recognizing appellant's possible drug dealing was merely suggested and no testimony was presented concerning such behavior); *State v. Robinson*, 238 S.C. 140, 119 S.E.2d 671 (1961), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (holding that, even if the testimony created the inference in the jury's mind that the accused had committed another crime, the State never attempted to prove the accused had been convicted of some other crime); *State v. Creech*, 314 S.C. 76, 81–82, 441 S.E.2d 635, 638 (Ct.App.1993) (holding trial judge did not abuse his discretion in denying defendant's motion for a mistrial when officer testified that he obtained warrants for defendant's arrest and contacted "the Probation Officer"). Accordingly, Martucci is not entitled to a new trial.

## IV. HARMLESS ERROR

██ Assuming, *arguendo*, that the trial judge did err in admitting Parker's testimony, such error was harmless. Whether an error is harmless depends on the circumstances of the particular case. *In re Harvey*, 355 S.C. 53, 63, 584 S.E.2d 893, 897 (2003); *Taylor*, 333 S.C. at 172, 508 S.E.2d at 876; *State v. Thompson*, 352 S.C. 552, 562, 575 S.E.2d 77, 83 (Ct.App.2003). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151.

██ Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey*, 355 S.C. at 63, 584 S.E.2d at 897; *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton*, 326 S.C. 605, 610, 486 S.E.2d 762, 764 (Ct.App.1997). Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *Sherard*, 303 S.C. at 176, 399 S.E.2d at 597; *Adams*, 354 S.C. at 380–81, 580 S.E.2d at 795. Thus, an insubstantial error not affecting the result of the trial is harmless when guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989). The admission of improper evidence is harmless where the evidence is merely cumulative to other evidence. *State v. Blackburn*, 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978); *Weaverling*, 337 S.C. at 471, 523

S.E.2d at 793; *see also State v. Williams*, 321 S.C. 455, 463, 469 S.E.2d 49, 54 (1996) (instructing that error in admission of evidence is harmless where it is cumulative to other evidence which is properly admitted).

There was overwhelming and independent evidence of Martucci's guilt. Parker testified about Martucci's prior abuse of Child and that Martucci was the last person with Child before he died. Martucci lied to the police and hospital personnel about the cause of Child's injuries. Holder told the police about Martucci's physical abuse of Child just before his death. This evidence, together with other physical evidence in this case, clearly demonstrates Martucci's guilt of homicide by child abuse was conclusively proven by competent evidence such that no other rational conclusion could be reached. Given this substantial and overwhelming evidence of Martucci's guilt, the challenged evidence was cumulative and its admission is not a ground for reversal. *Baccus*, 367 S.C. at 55–56, 625 S.E.2d at 224; *Adams*, 354 S.C. at 381, 580 S.E.2d at 795.

There was other evidence demonstrating Parker's fear of Martucci which was admitted without objection. Deputy Wesley Smith interviewed Parker at the law enforcement center on the day of Child's death. Smith testified Parker "was cooperative. He really acted like he was scared of Mr. Martucci and what his involvement in the case would be and what would happen to him." Smith vouched Parker "was always kind of hesitant" about answering questions. He advanced Parker "cried some" during the interview because he told him that he was afraid of Martucci. *See State v. Johnson*, 298 S.C. 496, 498, 381 S.E.2d 732, 733 (1989) (stating admission of improper evidence is harmless where it is merely cumulative to other evidence); *Broaddus*, 361 S.C. at 542, 605 S.E.2d at 583–84 (holding error in admission of drug evidence was harmless where it was cumulative to other unobjected-to testimony at trial regarding drug use and drug dealing); *State v. Richardson*, 358 S.C. 586, 596–97, 595 S.E.2d 858, 863 (Ct.App.2004) (holding that even if the challenged testimony constituted improper "character evidence," any error in its admission was harmless where the testimony was cumulative to other similar testimony that was admitted without objection); *see also State v. Brown*, 344 S.C. 70, 75, 543 S.E.2d 552, 555 (Ct.App.2001) (holding any error in admitting evidence of

murder defendant's violent character was harmless as properly admitted evidence of the defendant's use of force during his argument with victim the previous day clearly demonstrated defendant's propensity to become violent).

If the admission of Parker's testimony was erroneous, it was clearly harmless beyond a reasonable doubt because its impact was minimal in context of the entire record.

## CONCLUSION

We hold the trial court properly admitted autopsy photographs which were relevant to prove Child was abused, that the abuse was the cause of his death, and the abuse manifested an extreme indifference to human life, all of which support the charge for which Martucci was under indictment. The evidence of Martucci's prior abuse of Child was admissible to show intent, the identity of the abuser, the absence of mistake or accident, and a common scheme or plan of abuse. We determine any error in the admission of Parker's testimony about Martucci's character is not preserved. Had the issue been preserved, the testimony would be cumulative to unobjected-to testimony and concomitantly harmless.

Accordingly, Martucci's conviction is

**AFFIRMED.**

WILLIAMS and KONDUROS, JJ., concur.