746 S.E.2d 495

**The STATE, Respondent,**

**v.**

**Lexie DIAL, III, Appellant.**

**Appellate Case No. 2011–190693.**
**No. 5157.**

Court of Appeals of South Carolina.

Heard May 7, 2013.

Decided July 10, 2013.

Rehearing Denied Aug. 22, 2013.

250

H. Wayne Floyd, of Wayne Floyd Law Office, of West Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Christina J. Catoe, both of Columbia, for Respondent.

LOCKEMY, J.

Lexie Dial, III appeals his conviction of homicide by child abuse. Dial argues the trial court committed reversible error by: (1) ruling officer Henry Dukes had arrest authority as a United States Marshal under section 23–1–220 of the South Carolina Code (2007), or in the alternative, as a citizen pursuant to section 17–13–10 of the South Carolina Code (2003); (2) refusing to allow Dial to impeach the State's lead investigator; (3) denying his motion for a mistrial after Victim's mother brought an urn to the witness stand; (4) admitting autopsy photographs into evidence; (5) refusing to admit the pathologist's conflicting death certificates; and (6) sentencing him to the maximum sentence permitted under South Carolina law without properly considering the aggravating and mitigating circumstances. We affirm.

## FACTS

On January 10, 2010, Dial was at his home in Lexington County with his five-month-old son (Victim) when Victim sustained severe head injuries. Victim began suffering breathing problems and Dial tried CPR, which was unsuccessful. Dial then called his father, who came to the home and attempted CPR as well. All CPR attempts failed, and emergency personnel responded after Dial's father made a 911 call. At the scene, Dial claimed he fell while holding Victim, and when he fell, Victim's head hit a coffee table that was in the room.

Victim was initially transported to Lexington Medical Center but was transferred to Richland Memorial Hospital[1] in Richland County. Early the next afternoon, Victim passed away. Lexington County major crimes investigator Eric Russell was placed in charge of investigating Victim's death. Russell spoke with Victim's doctors and based on their diagnoses and explanations, he asked Officer Luis Rivera to obtain a warrant for Dial for great bodily injury to a child. The first warrant was issued prior to Victim's death, but once Victim passed away, it was withdrawn. A new warrant for homicide by child abuse was issued against Dial. Officer Dukes, a

---

1. Richland Memorial Hospital is now known as Palmetto Health Richland. Witnesses referred to it by different names throughout the record.

Lexington County officer with the U.S. Marshal's fugitive task force, arrested Dial at Richland Memorial.

Russell questioned Dial at the Lexington County Detention Center and obtained a statement from him. Dial first stated he was carrying Victim when he tripped over a steam cleaner in the living room and fell through a coffee table. Dial said that after the fall, Victim was gasping for breath so he shook Victim in a manner that would not have caused injury. Russell explained to Dial that he had spoken with the doctors, and Dial's version of the events did not match their description of Victim's symptoms and injuries. Dial then admitted to Russell in a second statement he had been frustrated at the Victim for failing to walk so he shook Victim. At trial, Russell stated he never mentioned anything about shaken baby syndrome to Dial. Dial claimed at trial he made the second statement out of fear and after being told cooperation would help him.

At trial, Dr. Shuler, with Lexington Medical Center, testified he was given a history stating Victim was dropped on a coffee table, and Victim's bilateral bleeding and subdural hematoma could have been caused by a drop on a coffee table. Further, Dr. Shuler stated the small 2–3 inch bruise found on the back of Victim's head could have been caused by Victim's head striking an object. Dr. Sarah Webb–Wood, a pediatric resident at Richland Memorial, stated Victim was brain dead when she saw him, and she ordered a skeletal survey to determine whether prior injuries existed. She found a large amount of blood in Victim's eye area and bleeding on both sides of his brain. Dr. Susan Luberoff, a pediatrician, was called in to assist Dr. Webb–Wood with Victim. Dr. Luberoff stated Victim had non-accidental blunt force trauma, with extensive retinal hemorrhaging. She did not believe the injuries could have been accidentally caused, but conceded the pathologist was best suited to determine the cause of death. Dr. Edward Cheeseman, an ophthalmologist, also examined Victim. He found numerous hemorrhages in Victim's eyes and found he suffered from retinaschisis, which could be caused by a back and forth acceleration or a fall, although falls are usually accompanied by crushing type injuries of the skull. Dr. Cheeseman opined it was unlikely Victim hit his head on a table because there were no crushing skull injuries. His

diagnosis was shaken-baby syndrome. Dr. Greta Harper, a pediatric critical care specialist, also opined Victim died from shaken-baby syndrome.

Dr. Janice Ross, a forensic pathologist, testified she found subdural and subarachnoid hemorrhaging.[2] She determined Victim's death was a homicide caused by subdural hemorrhaging due to blunt force trauma to the head but initially wrote on Victim's death certificate that Victim died from hitting his head on an object or surface. Thereafter, she edited the death certificate to omit the language regarding Victim hitting his head on an object because there was an ongoing investigation and she did not want to narrow the possibilities for the cause of death. Dr. Ross conceded she could not rule out more than one injury as leading to Victim's death.

The jury found Dial guilty of homicide by child abuse. The trial court sentenced Dial to life imprisonment, and this appeal followed.

## STANDARD OF REVIEW

█ " 'In criminal cases, the appellate court sits to review errors of law only. We are bound by the trial court's factual findings unless they are clearly erroneous.' " *State v. Bonner,* 400 S.C. 561, 564, 735 S.E.2d 525, 526 (Ct.App.2012) (quoting *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001)).

## LAW/ANALYSIS

### Arrest Authority

Dial first argues Dukes was a Lexington County Sheriff's officer with no authority or jurisdiction to arrest in Richland County. Thus, Dial contends his arrest was unlawful. We disagree.

Prior to Dukes's testimony at trial, Dial made a motion to dismiss his charge because Dukes lacked authority to arrest him. As alternate relief, Dial requested exclusion of any evidence obtained subsequent to the arrest as being the fruit of the poisonous tree. In response, the State presented a Memorandum of Understanding (MOU) between the Lexing-

---

2. The arachnoid is a thin membrane covering the surface of the brain. The bleeding was subarachnoid, underneath the arachnoid but on top of the brain's surface.

ton County Sheriff's Office and the United States Marshals Service. The trial court denied Dial's motion, finding the MOU and the warrant were valid and therefore the arrest was valid. In the alternative, it found under *State v. Swilling*, 249 S.C. 541, 155 S.E.2d 607 (1967), and pursuant to section 17–13–10, Dukes made a valid citizen's arrest, because the arrest was made upon certain information that a felony had been committed. During Dukes's testimony, Dial objected to his statement to Russell being placed into evidence, again arguing his arrest was unlawful. The trial court overruled the objection.

While Dial argues in his Statement of Issues the trial court erred in determining Dukes's authority arose from section 23–1–220, in the body of his argument he asserts the trial court erred in ruling that Dukes's authority arose from section 23–1–212 of the South Carolina Code (2007 & Supp.2012). Despite this discrepancy in statutes, Dial is inaccurate in his assertions that the trial court determined Dukes had authority pursuant to section 23–1–212 or section 23–1–220. After the State and Dial presented their arguments on the issue, the trial court ultimately found the agreement between Lexington County and the U.S. Marshals was valid because there was no testimony otherwise, and the warrant was valid. It ruled that as a result, Dukes had authority to arrest Dial in Richland County. It did not specify any statutory authority in its final decision, and neither party requested clarification regarding the statutory authority upon which the trial court based its decision.

■ The MOU stated the Lexington County Sheriff's Office entered into an agreement with the U.S. Marshals pursuant to the Presidential Threat Protection Act of 2000. 28 U.S.C. § 566 (2006 & Supp.2012). The MOU's primary purpose was to create a task force that would "investigate and arrest, as part of joint law enforcement operations, persons who have active state and federal warrants for their arrest." Further, the MOU explained "[t]he authority of the United States Marshals and Deputy U.S. Marshals to, 'in executing the laws of the United States within a State ... exercise the same powers which a sheriff of the State may exercise in executing the laws thereof' is set forth in 28 U.S.C. § 564."

■ We find the MOU was valid pursuant to its cited federal authority. Because the MOU recites that U.S. Marshals and their deputies have "the same powers which a sheriff of the State may exercise in executing the laws thereof," Dukes, as a specially deputized member of the task force, had the same arrest authority as the Richland County Sheriff. A sheriff may arrest someone within his county pursuant to an arrest warrant, and, therefore, Dukes had authority under the MOU and § 564 to arrest Dial in Richland County. Consequently, we find the arrest was lawful, and we affirm the trial court. Because we affirm the trial court on the first independent ground, we need not reach the argument regarding a citizen's arrest. *See Henry v. Lewis,* 327 S.C. 336, 340 n. 1, 489 S.E.2d 639, 641 n. 1 (Ct.App.1997) (stating that because the appellate court affirmed the circuit court on one independent ground, it need not reach the alternative ground).

## Cross–Examination Regarding Bias

Dial argues the trial court erred in not allowing cross-examination of Russell regarding Russell's romantic relationship with the assistant solicitor initially assigned to the case. Specifically, he contends the State did not show the cross-examination was clearly improper pursuant to Rule 608(c), SCRE, and thus, he should have been permitted to cross-examine Russell pursuant to Rules 401 and 403, SCRE, because Russell's bias and motive to lie were relevant issues in the trial.[3] We disagree.

Dial requested to cross-examine Russell regarding his romantic relationship with the assistant solicitor who was initially assigned to prosecute the case. In October of 2010, Russell and his then-wife separated due to the discovery that Russell was conducting a romantic relationship with the assistant solicitor. The solicitor's office withdrew from the case and the South Carolina Attorney General's Office took it over due to the potential conflict of interest arising from the relationship between the assistant solicitor and Russell. Dial argued the cross-examination was admissible to show Russell's personal bias and to question his credibility. The State argued the

---

3. Dial did not raise any constitutional argument at trial or on appeal regarding his right to confrontation.

connection between Russell's relationship with the assistant solicitor and Russell's conduct during Dial's questioning was too tenuous, regardless of the time period. The trial court ruled that pursuant to Rule 608(c), the cross-examination was not allowed, and it also found the cross-examination was not relevant to the case.

■ " 'As a general rule, a trial court's ruling on the proper scope of cross-examination will not be disturbed absent a manifest abuse of discretion.' " *State v. Quattlebaum*, 338 S.C. 441, 450, 527 S.E.2d 105, 109 (2000) (quoting *State v. Mitchell*, 330 S.C. 189, 196, 498 S.E.2d 642, 645 (1998)). "Rule 608(c), SCRE, provides that 'bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced.' " *State v. Sims*, 348 S.C. 16, 25, 558 S.E.2d 518, 523 (2002) (quoting *State v. Jones*, 343 S.C. 562, 570, 541 S.E.2d 813, 817 (2001)). "Rule 608(c) 'preserves South Carolina precedent holding that generally, anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony.' " *Id.* (quoting *Jones*, 343 S.C. at 570, 541 S.E.2d at 817).

■ Here, the timeline of Russell's and the assistant solicitor's romantic relationship was not definitively established. Russell claimed the relationship did not occur until October 2010, ten months after he took Dial's confession, and denied there was any romantic relationship at the time of Dial's investigation. *See State v. Beckham*, 334 S.C. 302, 321, 513 S.E.2d 606, 615 (1999) (stating "[w]hen a witness denies an act involving a matter collateral to the case in chief, the inquiring party is not permitted to introduce contradictory evidence to impeach the witness"). Further, the solicitor's office removed the assistant solicitor from the case when the improper relationship was discovered, and the Attorney General took over the case. The assistant solicitor had no involvement with the prosecution at the time of trial. We find the connection between the romantic relationship and Russell's bias merely speculative, and the trial court did not abuse its discretion in limiting the cross-examination. Accordingly, we affirm.

## Motion for Mistrial

Dial argues the trial court committed reversible error by denying his motion for a mistrial after Misti Richard, Victim's mother, approached the witness stand with an urn in her hands containing Victim's ashes. Dial contends Richard's actions caused severe prejudice to him and only served to sway the emotions of the jury. We disagree.

"The decision to grant or deny a mistrial is within the sound discretion of the trial court." *State v. Wiley*, 387 S.C. 490, 495, 692 S.E.2d 560, 563 (Ct.App.2010). "The trial court's decision will not be overturned on appeal absent an abuse of discretion amounting to an error of law." *Id.* "The power of the trial court to declare a mistrial should be used with the greatest caution under urgent circumstances and for very plain and obvious reasons stated on the record by the trial court." *Id.* "A mistrial should only be granted when absolutely necessary, and a defendant must show both error and resulting prejudice in order to be entitled to a mistrial." *Id.* "The granting of a motion for a mistrial is an extreme measure that should only be taken if an incident is so grievous that the prejudicial effect can be removed in no other way." *Id.* at 495–96, 692 S.E.2d at 563.

When the State called Richard as a witness, she approached the witness stand carrying a bronze, heart-shaped urn containing Victim's ashes. The trial court immediately prevented her from advancing any further and asked the jury to leave the courtroom. The jury was removed, and Dial requested a mistrial based on the extremely prejudicial nature of the urn in eyesight of the jury. Dial argued the action was a ploy to sway the jurors to convict him out of emotion and sympathy.

The trial court noted Richard approached the witness stand in a "very low-grade manner," and it did not believe any of the jury members saw the urn or knew it was an urn. The trial court measured the urn and found it was slightly less than three inches in width and about two-and-a-half inches in length. The trial court denied Dial's motion given the small size of the item, the manner in which Richards approached the witness stand, and the fact that the trial court had the best view of the item and still did not know it was an urn. Dial again requested a mistrial because the urn was shaped like a

heart, and the jurors were likely to figure out it was an urn. The trial court also denied that motion, stating it did not think the jury saw the item, and offered to give a curative instruction. Dial suggested language for the curative instruction, but the trial court declined to use it and issued a general instruction to the jury. Dial noted for the record that he preferred the more specific instruction.

■■ A curative instruction is generally deemed to have cured any alleged error. *State v. Walker*, 366 S.C. 643, 658, 623 S.E.2d 122, 129 (Ct.App.2005). Here, the trial court issued the following instruction to the jury:

> Again, I would advise you that you may not allow yourself to be governed by sympathy, prejudice, passion, public opinion, emotions, any improper conduct or any other arbitrary factors.

> Both the State and the Defendant have a right to expect that each of you will carefully and impartially consider all of the evidence in the case and that you will follow the law as I instruct it to you.

> The State has the burden of proving its case beyond a reasonable doubt. The Defendant is presumed to be innocent. He does not have to prove his innocence. He does not have to present evidence or testimony in any manner.

> He is entitled under the Constitution of our State and United States Constitution to a fair and impartial trial, based on the law and evidence from the witnesses testifying under oath, and any inferences that you may properly draw from that evidence.

We believe any alleged error or prejudice was cured by the curative instruction. Dial could not establish that any juror saw the item in Richard's hands. Moreover, he could not show the item would be recognizable as Victim's urn if in fact a juror did see it. The trial court noted Richard approached the witness stand in a normal manner without attracting attention to the item, and the trial court, which had the best view of the urn, was not aware of the exact nature of the item when it excused the jury. Further, the thorough curative instruction ensured the jurors knew they were to base any decision on the facts presented at trial, not on emotional

response or improper conduct. Accordingly, we affirm the trial court's denial of Dial's motion for a mistrial.

## Autopsy Photographs

■ Dial argues the trial court erred in admitting autopsy photographs into evidence. He maintains that pursuant to Rule 403, SCRE, State's Exhibits 7, 8, and 86 were much more prejudicial than probative due to their gory and shocking nature. We disagree.

During Dr. Ross's testimony, the trial court admitted three autopsy photographs of Victim's head injuries over Dial's objection that the photographs were shocking and gross. The trial court ruled the photographs would assist Dr. Ross in showing the force or violence in which Victim's injuries occurred.

Dr. Ross testified *in camera* that she regularly took pictures as part of performing autopsies. She stated it aided her testimony to be able to show the photographs she took of Victim. State's Exhibit 86 depicted Victim's scalp area, with the skin over the scalp folded back to reveal Victim's skull and brain. Dr. Ross stated it was important to examine this inside fold of skin to identify a possible pattern of injury, including blunt force injuries. In Victim's case, there was no contusion or bruising, and she was able to definitively conclude there was no bruising on the back of the head. State's Exhibit 8 depicted the top of the brain with a subarachnoid hemorrhage. The exhibit further showed the surface of the brain was flat which indicated it was swollen. Dr. Ross testified that the depiction helped identify that there was enough edema to have swelling of the brain, and that the bleeding would have been started by the original trauma. State's Exhibit 7 showed the subdural space in the brain after the brain had been removed. It depicted hemorrhaging on the right and left sides of the brain. She stated the hemorrhaging pictured typically results from the brain being jostled around and from pulling on the veins surrounding the brain's surface. She testified the bleeding was caused by the original trauma that led to Victim's death, and the photographs would be helpful in explaining the injury to the jury. The trial court conducted a Rule 403 analysis and found the three contested exhibits corroborated

Dr. Ross's testimony and supported her conclusive findings, and thus, it found they were admissible.

 "The State has the right to prove every element of the crime charged. . . ." *State v. Martucci,* 380 S.C. 232, 249, 669 S.E.2d 598, 607 (Ct.App.2008) (citing *State v. Johnson,* 338 S.C. 114, 122, 525 S.E.2d 519, 523 (2000)). " 'The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion.' " *Id.* (quoting *State v. Haselden,* 353 S.C. 190, 199, 577 S.E.2d 445, 450 (2003); *State v. Rosemond,* 335 S.C. 593, 596, 518 S.E.2d 588, 589–90 (1999)); *see also State v. Kelley,* 319 S.C. 173, 177, 460 S.E.2d 368, 370 (1995) (stating the trial court has "considerable latitude in ruling on admissibility of evidence and his rulings will not be disturbed absent showing of probable prejudice"). " 'The trial judge must balance the prejudicial effect of graphic photographs against their probative value.' " *Martucci,* 380 S.C. at 249, 669 S.E.2d at 607 (quoting *State v. Vang,* 353 S.C. 78, 87, 577 S.E.2d 225, 229 (Ct.App.2003)). "A trial judge's decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances." *Id.* at 250, 669 S.E.2d at 607 (citing *State v. Hamilton,* 344 S.C. 344, 357, 543 S.E.2d 586, 593 (Ct.App.2001)). "Admitting photographs which serve to corroborate testimony is not an abuse of discretion." *Id.* (citing *Rosemond,* 335 S.C. at 597, 518 S.E.2d at 590). "However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions." *Id.* (citing *State v. Brazell,* 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997)). " 'To constitute unfair prejudice, the photographs must create a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.' " *Id.* (quoting *Kelley,* 319 S.C. at 178, 460 S.E.2d at 370–71). "A trial judge is not required to exclude relevant evidence merely because it is unpleasant or offensive." *Id.* (citing *Davis v. Traylor,* 340 S.C. 150, 155, 530 S.E.2d 385, 387 (Ct.App.2000)).

Dial claimed he tripped and fell with the Victim in his arms, and thus, Victim's injuries were accidental. These photographs were introduced to corroborate the testimony of Dr. Ross, who testified regarding the Victim's various injuries,

including the placement and severity of bruising, which would be inconsistent with an accidental injury. She testified the photographs would aid in her testimony. We find the photographs were highly probative to the issues of whether Victim was abused and whether the abuse was the cause of his death, which are integral elements to the charge of homicide by child abuse. *See* S.C.Code Ann. § 16–3–85(A)(1) (2003). Thus, we find the danger of unfair prejudice did not outweigh the photographs' probative value, and the trial court did not abuse its discretion by admitting them. Accordingly, we affirm the trial court's decision.

**Admission of Death Certificates**

■ Dial argues the trial court erred in excluding copies of Dr. Ross's death certificate reports. He maintains the conflicting death certificates authored by the same doctor were relevant and should have been admitted pursuant to Rules 401 and 403, SCRE.

Dial attempted to place Victim's death certificates authored by Dr. Ross into evidence, because her initial determination supported his theory that Victim's injuries were sustained by a fall onto the coffee table. The trial court refused Dial's request, stating the evidence would unduly highlight the apparent change in Dr. Ross's opinion. Dr. Ross testified she initially described the injury on the death certificate as one where the Victim's head hit an object. She subsequently changed the description because there was an ongoing investigation, and she realized the injuries were such that the head could have been hit by something or could have hit an object. She removed any language from that section of the death certificate and left it blank. She admitted she spoke with the coroner after she removed the language.[4]

While it may be argued the trial court erred in refusing to admit the death certificates into the record, we find the error, if any, was harmless. *See State v. McLeod*, 362 S.C. 73, 82, 606 S.E.2d 215, 220 (Ct.App.2004) ("Error is harmless where it could not reasonably have affected the result of the trial. Generally, appellate courts will not set aside convictions due to

---

4. Dial asserts Dr. Ross spoke with the coroner after she completed the first death certificate and then decided to remove the description. However, Dr. Ross testified she spoke with the coroner only after she altered the death certificate.

insubstantial errors not affecting the result." (citations omitted)). The first document merely had a description stating, "head hit object," while the second document did not contain any description and had a blank space. Dr. Ross testified to the exact changes made to the two documents, and she thoroughly explained the reason for the change. Moreover, Dial had the opportunity to fully cross-examine Dr. Ross about the death certificates and any changes made to them. We do not believe the admission of the documents would have affected the outcome of the trial. Accordingly, we affirm the trial court's decision.

**Sentencing**

 Dial contends the trial court committed reversible error in sentencing him to the maximum sentence permitted under section 16–3–85(D) because he maintains the trial court did not properly consider the aggravating and mitigating circumstances. He maintains the record clearly demonstrates there were no aggravating circumstances in his past history with Victim or any other child under the age of eleven, and the trial court did not accord any weight to the mitigating factors he presented at trial.[5] We find this issue was not preserved for our review.

The State argues Dial did not preserve this argument for our review because he did not raise it at the trial. *See State v. Johnston*, 333 S.C. 459, 462, 510 S.E.2d 423, 425 (1999) ("[T]his [c]ourt has consistently held that a challenge to sentencing must be raised at trial, or the issue will not be preserved for appellate review.") We agree. The record reflects Dial did not raise an objection during or after sentencing. *See State v. Salisbury*, 330 S.C. 250, 276, 498 S.E.2d 655, 669 (Ct.App.1998) (finding that to preserve any alleged error in sentencing, a party must make a contemporaneous objection). Accordingly, we find this issue was not preserved.

**CONCLUSION**

For the foregoing reasons, Dial's conviction is

**AFFIRMED.**

CURETON, A.J., concurs.

---

5. Despite Dial's contention, the trial court did discuss and weigh aggravating and mitigating factors before sentencing Dial.

**FEW, C.J., concurring.**

I agree with the majority's decision to affirm. I also agree with most of the majority's analysis. However, as to the denial of the mistrial motion and the exclusion of the death certificates, I would find the trial court committed no error. With no error, further analysis of those issues is not necessary.