# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Kayla Marie Cook, Appellant.

Appellate Case No. 2019-001417

Appeal From Lancaster County
R. Lawton McIntosh, Circuit Court Judge

Opinion No. 5995
Heard December 6, 2022 – Filed June 28, 2023

## AFFIRMED

Appellate Defender Kathrine H. Hudgins; and Daniel J. Westbrook and Amber Modestine Steele Hendrick, both of Nelson Mullins Riley & Scarborough, LLP, all of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Senior Assistant Attorney General Mark Reynolds Farthing, both of Columbia; and Solicitor Randy E. Newman, Jr., of Lancaster, all for Respondent.

**WILLIAMS, C.J.:** Kayla Marie Cook appeals her conviction for homicide by child abuse, arguing the trial court erred in (1) refusing to grant a mistrial and (2) allowing the introduction of evidence that the minor victim suffered an arm injury two- to four-weeks prior to her death. We affirm.

## FACTS/PROCEDURAL HISTORY

The victim in this case is a three-year-old girl (Minor). Minor lived with her father (Father), Cook, and Cook's eighteen-month-old son and five-year-old daughter. Cook is not Minor's mother. Cook's neighbor, Miriam Myers, testified at trial that Cook came to her house on the morning of December 18, 2017, and asked for help because Minor was not breathing. Myers and Cook ran to Cook's house where Minor was lying unresponsive on the couch. Myers recalled that Minor was very blue, "ice cold," and had no signs of breathing. Other neighbors came to the house and Myers and Earlene Cochran began performing CPR. Law enforcement was called at 12:04 p.m. and immediately transported Minor to the hospital.

Dr. Alexander Vinuya testified that when Minor arrived at the hospital, she was very cold with no heartbeat and he was told she drowned in the bathtub. Dr. Vinuya tried to resuscitate Minor for more than an hour and a half, and eventually pronounced Minor dead at 1:32 p.m. Dr. Vinuya stated he found it suspect that Minor was fully clothed even though he was told Minor had slipped and fallen in the bathtub. He testified that based on how cold Minor's body was when she came to the hospital, she would have been dead for at least thirty minutes. Dr. Vinuya noted an obvious, severe, "palm sized" bruise on Minor's abdomen that Cook explained occurred when Minor had an accident with a dog.

During her six-hour police interview on the day of Minor's death, Cook described the events of the evening of December 17 and the morning of December 18. Cook changed portions of her account several times throughout the interview. Generally, Cook stated that the night before her death, Minor had a potty-training accident in her pants and Cook cleaned her, dressed her, and put her to bed. Cook then left the house with her younger child for a couple of hours and came back. When she returned, Cook and Father watched a movie and went to bed in the same bed with Minor and the other two children around 10 or 11 p.m. Cook woke up around 6:30 a.m. Father left for work before she and the children were awake. While Cook tidied up the house, Minor had another potty-training accident. Cook told her to go into the bathroom and Cook began running a lukewarm bath for Minor. She left Minor in the bathtub with water up to her belly button.

Cook continued to tidy the house and became frustrated because her younger child was screaming and pulling on her. She realized Minor had been very quiet in the tub. She also stated she thought Minor had fallen in the tub. Cook went into the bathroom where Minor was lying in the bathtub face-up with the water at her ears and was looking at her. She was breathing but very still, and Cook thought she

was joking.  Cook picked her up out of the tub and dried her off.  A neighbor knocked on the door and Cook answered the door but said to come back later because Minor had fallen in the tub.  Cook described Minor as cold but "fine." Minor was looking at her, moving her eyes, and breathing.  She was not talking. Cook wrapped her in blankets and put her on the couch.  Minor started making gurgling noises and her eyes were not focused.  Cook stated she ran out of the house to find help.  Later in the interview, Cook spontaneously questioned why an autopsy was being performed on Minor and said maybe it was because she had "pushed" on Minor on the couch.  Upon further questioning, she amended her story to say she had pushed on Minor's chest and breathed into her mouth when Minor gurgled on the couch.  Cook said she did not think anything was wrong when she got Minor out of the tub.  Later in the interrogation, Cook stated she accidentally stepped on Minor with a boot a few days before.  She claimed Father saw a large abdominal bruise when he cleaned Minor's bathroom accident.  Cook claimed Minor had multiple unexplained bruises and injuries that happened when Cook was not around.  Cook also claimed that Minor fell off the bed and was knocked down by the dogs.

Cook testified at trial that everything was "completely normal" with Minor on the morning of her death.  She said that she saw an abdominal bruise on Minor when Minor was in the bathroom but it did not cause her concern.  When Cook got Minor out of the bathtub, she still did not think anything was wrong.  She noticed minor was cold.  She also acknowledged that if anything had happened to Minor that morning before getting out of bed, she would have known about it because they were all in the same bed.  Cook also testified at trial that she saw Father whip Minor with a belt the night before her death.  In contravention of her previous statements, Cook denied accidentally stepping on Minor with a boot, claiming she lied to protect Father.  She denied seeing bruises on Minor's head the morning of her death.

Father testified at trial that he ate dinner with Cook, his other children, and Minor, the night before Minor's death.  Cook left the house with her two children to drop the older child off with the grandparents.  Before Cook left the house, Minor had a potty-training accident, and Father undressed her, cleaned her, and put her in clean clothes.  Father testified he did not see any bruising on Minor's abdomen, legs, or the back of her head as he was cleaning her.  Minor had bruising on her face that he had seen before.  Father testified that Cook spanked Minor twice as punishment for the potty-training accident.  After dinner and the diaper change, Father put Minor in bed and the household went to sleep.  Minor was asleep when Father left

for work the next morning.  After lunch, Father was called to the hospital and he was in the room when his daughter was pronounced dead.

Dr. Janice Ross performed the autopsy on Minor.  She observed bruising on Minor's forehead, eyeball, chin, and right ear.  There were seven bruises on her chest along with bruises on her groin/abdomen, elbows, hands, arms, and legs.  Minor also had bruising on the back of her head.  There was hemorrhaging throughout her torso and blood-tinged fluid in her abdominal and chest cavities.  Dr. Ross concluded Minor suffered a blunt force injury to her head that could not have been caused by a fall as her whole brain was swollen.  Dr. Ross stated that Minor's injuries would have caused her death within two hours.

Dr. Susan Lamb testified as an expert in child abuse pediatrics.  Dr. Lamb noted the bruising around Minor's ears and eyes were caused by Minor being hit upside the head and suffering blunt force trauma.  She stated that the major contributors to Minor's death, the abdominal hemorrhage and the brain injury, were inflicted upon her no more than two hours before her death.  She stated that the injuries inflicted on Minor would have caused her to be in "agony" for those two hours.

Dr. Amy Durso testified as an expert in forensic pathology.  She explained that the multiple bruises on Minor were not consistent with normal bruising for an active three-year-old and showed intentional infliction of trauma on the child.  She stated that the bruise on Minor's abdomen was dark and indicated a strong blow, and the internal examination showed significant bleeding which led to her death.  Minor's liver was lacerated, and there was significant hemorrhage around her intestines.  Dr. Durso examined sectioned slides of all of the injured areas on Minor's body and organs, and stated "you can't outright date a bruise."  Dr. Durso testified that Minor's injuries would have been very painful and led to her death in one hour or less.  Dr. Durso concluded Minor's injuries could not have been caused by a dog, other children, or a fall.

Sergeant Jodi Sims testified that the police investigation showed that Cook was the only one in the house with Minor on the morning of her death, and was "the only one that could have caused her death."

Cook presented the expert testimony of Dr. Nicholas Batalis, a forensic pathologist.  Dr. Batalis opined that Minor's death was not caused by her head injury but was caused by the abdominal injury.  Dr. Batalis testified it was unlikely the abdominal injury happened the morning of Minor's death, and could have been inflicted one to three days prior.  Dr. Batalis stated the abdominal injury was the

type that would have come from a high-speed car wreck, falling off a balcony, or being kicked, stomped or punched. Dr. Batalis stated "the color of the bruise gives us the best information of the dating of the injury."

Cook made a pre-trial motion to suppress evidence relating to an injury to Minor's arm, arguing there was no evidence Cook caused the injury. The State argued "the aspect of it that we think is relevant to this case is a pattern of abuse in the days coming before Minor's death." The trial court denied the motion and ruled the "failure in light of the injury to get medical care meets the intent aspect of the statute under extreme indifference and that's the reason it's being introduced." There was both medical testimony and testimony from witnesses, including Cook, that Minor suffered a broken arm from a possible fall off the bed in the weeks before her death. However, Myers testified that Minor said "[Cook] did it" and pointed at Cook. Minor's grandmother testified Cook told her the injury was being treated. The trial court instructed the jury twice during witness testimony that the evidence relating to Minor's arm injury was only to be considered for extreme indifference, and the injury did not cause Minor's death.

During the State's direct-examination of the lead investigator on the case, Agent Baird, the solicitor asked whether Baird had viewed Cook's five-year-old daughter's forensic interview. The following occurred:

> **Q:** Was she able- you can't say what she said at all,
> okay? But was she able to give you information?
>
> **A:** Yes. The forensic interview, along with all the other
> evidence in the case, reinforced the fact that [Cook] did
> cause Minor's death.

Cook moved for a mistrial, stating "[t]he objection is, she said that it indicated that [Cook] did it. . ... I don't think we can come back from that." The trial court denied the motion and asked if Cook requested an additional curative instruction besides the jury not considering the statement. Cook argued the instruction was insufficient and did not propose an additional instruction. The trial court gave the following instruction to the jury:

> [T]he witness's last response to the question posed to her
> is stricken from the record. You may not and shall not
> consider it at all in your deliberations, when you're told

to begin deliberations. And that's your job to make sure
that's not part of the jury's deliberation, okay, sir?

The jury found Cook guilty of homicide by child abuse, and the trial court sentenced her to life in prison.

**ISSUES ON APPEAL**

I. Did the trial court err in refusing to grant a mistrial when the witness testified the information obtained from the forensic interview of Cook's five-year-old daughter "reinforced the fact" of Cook's guilt?

II. Did the trial court err in refusing to grant Cook's motion to suppress evidence of an injury to Minor's arm that did not contribute to her death?

**STANDARD OF REVIEW**

"In criminal cases, the appellate court sits to review errors of law only." *State v. Martucci*, 380 S.C. 232, 246, 669 S.E.2d 598, 605 (Ct. App. 2008). "The decision to grant or deny a mistrial is within the sound discretion of the trial court." *State v. Wiley*, 387 S.C. 490, 495, 692 S.E.2d 560, 563 (Ct. App. 2010). "The trial court's decision will not be overturned on appeal absent an abuse of discretion amounting to an error of law." *Id.*

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *Martucci*, 380 S.C. at 247, 669 S.E.2d at 606 (quoting *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001)). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *Id.* (quoting *State v. Irick*, 344 S.C. 460, 463, 545 S.E.2d 282, 284 (2001)).

**LAW/ANALYSIS**

**I.      Motion for Mistrial**

Cook argues the trial court erred in denying her motion for a mistrial after Agent Baird testified that the forensic interview of Cook's five-year-old daughter, "along with all the other evidence in the case, reinforced the fact that [Cook] did cause Minor's death." Cook argues Baird's statement was inadmissible hearsay and no instruction could have cured the error. We disagree.

> The power of the trial court to declare a mistrial should be used with the greatest caution under urgent circumstances and for very plain and obvious reasons stated on the record by the trial court. A mistrial should only be granted when absolutely necessary, and a defendant must show both error and resulting prejudice in order to be entitled to a mistrial. The granting of a motion for a mistrial is an extreme measure that should only be taken if an incident is so grievous that the prejudicial effect can be removed in no other way.

*State v. Dial*, 405 S.C. 247, 257, 746 S.E.2d 495, 500 (Ct. App. 2013) (citations omitted). "A curative instruction is generally deemed to have cured any alleged error." *Id.* at 258, 746 S.E.2d at 501. "If the trial [court] sustains a timely objection to testimony and gives the jury a curative instruction to disregard the testimony, the error is deemed to be cured." *State v. George*, 323 S.C. 496, 510, 476 S.E.2d 903, 911–12 (1996).

Here, we find the trial court's instruction sufficiently cured the error of Agent Baird's testimony. The trial court sternly instructed jurors not to consider the testimony and reinforced this admonition during its final instructions to the jury, stating, "[A]ny evidence that has been stricken from the record . . . may not be considered by you in this case. You must treat it as if it was not presented at all." Agent Baird's testimony inferred that Cook's five-year-old daughter gave investigators reason to believe Cook harmed Minor, but the testimony was not specific and was not alluded to again during trial. Coupled with the curative instruction, we find the testimony does not rise to the extreme, urgent, and grievous level necessitating a mistrial. *See State v. Smith*, 290 S.C. 393, 395, 350 S.E.2d 923, 924 (1986) (noting that to cure error, "the jury should be specifically instructed to disregard the evidence, and not to consider it for any purpose during deliberations"); *State v. Grovenstein*, 335 S.C. 347, 353, 517 S.E.2d 216, 219 (1999) ("[J]urors are presumed to follow the law as instructed to them.").

The dissent characterizes this case as a classic "Whodunnit?" However, overwhelming evidence shows that Cook was the only person who could have "done it." There was testimony that Father left before Cook woke up at 6:30 a.m. Cook testified that Minor was "completely normal" that morning when Cook woke her up. Minor died at the hospital at 1:32 p.m. Dr. Janice Ross testified Minor's injuries would have caused her death within two hours. Dr. Susan Lamb

testified the major contributors to Minor's death, the abdominal hemorrhage and the brain injury, were inflicted upon her no more than two hours before her death. Dr. Amy Durso testified Minor's injuries would have led to her death in one hour or less. Moreover, Sergeant Jodi Sims testified the police investigation showed that Cook was the only one in the house with Minor on the morning of her death and was "the only one that could have caused her death."

Cook argues Dr. Batalis "was unable to say to a reasonable degree of medical certainty that Minor's abdominal injuries, which caused her death, were inflicted, rather than accidental. Therefore, the jury was confronted with the additional question of whether Minor's fatal injuries were inflicted by someone or the result of a terrible accident." While Dr. Batalis stated the abdominal injury, if accidental, was the type that would have come from a high-speed car wreck or falling off a balcony, there was no evidence presented nor was there any allegation that Minor was in a high-speed car accident or fell off a balcony in the days before her death. Experts testified the injuries that caused Minor's death were not accidental. Dr. Ross testified Minor suffered a blunt force injury to her head that could not have been caused by a fall. Dr. Lamb testified the bruising around Minor's ears and eyes were caused by Minor being hit "upside the head." Dr. Durso stated Minor's injuries could not have been caused by a dog, other children, or a fall.

Accordingly, the trial court did not err in refusing to grant a mistrial.

## II.     Evidence of Prior Arm Injury

Cook contends the trial court erred in admitting evidence of Minor's prior arm injury, arguing it was not relevant and "there was no evidence that it was the result of an inflicted blow by [Cook] or anyone else." Cook further argues there was no logical connection between Minor's injured arm or Cook's alleged failure to obtain treatment for the injury. We disagree.

"A person is guilty of homicide by child abuse if the person: (1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." S.C. Code Ann. § 16-3-85(A)(1) (2015).

This court has held that a defendant's alleged prior acts of abuse toward a minor victim were admissible under the "common scheme or plan" exception in a

homicide by child abuse case.  *See Martucci*, 380 S.C. at 256, 669 S.E.2d at 611.[1]
"Prior bad act evidence is admissible where the evidence is of such a close
similarity to the charged offense that the previous act enhances the probative value
of the evidence so as to outweigh the prejudicial effect."  *Id.* at 255, 669 S.E.2d at
610.  The *Martucci* court noted when "the perpetrator is the parent or a person with
exclusive custody and control over the victim, proving the abuse becomes
extremely difficult."  *Id.* at 256, 669 S.E.2d at 610–11.  "As a result of the
difficulties in proving child abuse, 'evidence which shows a pattern of abuse
becomes even more probative than it might otherwise be.'"  *Id.* (quoting *State v.
Pierce*, 326 S.C. 176, 182, 485 S.E.2d 913, 916 (1997)).

Evidence of prior bad acts that are not the subject of a conviction must be
established by clear and convincing evidence.  *State v. Holder*, 382 S.C. 278, 293,
676 S.E.2d 690, 698 (2009).  "The evidence admitted 'must logically relate to the
crime with which the defendant has been charged.'"  *Id.* (quoting *State v. Stokes*,
381 S.C. 390, 404, 673 S.E.2d 434, 441 (2009)).

Here, as in *Martucci*,

> [T]he evidence of prior abuse against the same victim
> was not remotely disconnected in time from the conduct
> giving rise to the homicide by child abuse and was part of
> the same pattern of abuse showing extreme indifference
> to human life.  It was logically relevant to proving
> [Minor] died of multiple, non-accidental blunt force
> injuries and that [her] death was the result of child abuse.

*Id.* at 256, 669 S.E.2d at 611.[2]  The evidence showed that Cook hid her failure to
obtain medical treatment for Minor's arm injury.  Further, there was clear and
convincing testimony from Cook's neighbor that Minor identified Cook as having
inflicted the arm injury.  Therefore, we hold the trial court did not err in admitting
the arm injury testimony.

---

[1] "Evidence of other crimes, wrongs, or acts is not admissible to prove the
character of a person in order to show action in conformity therewith.  It may,
however, be admissible to show motive, identity, the existence of a common
scheme or plan, the absence of mistake or accident, or intent."  Rule 404(b), SCRE.
[2] The alleged abuse in *Martucci* occurred in the month and a half to several weeks
before the child's death.  *Id.*  Here, the injury occurred two- to four- weeks before
Minor's death.

**CONCLUSION**

Based on the foregoing, Cook's conviction is

**AFFIRMED.**

**THOMAS, J., concurs.**

**LOCKEMY, A.J., concurring in part and dissenting in part, in a separate opinion.**

**LOCKEMY, A.J., concurring in part and dissenting in part:**

I respectfully dissent. I concur with the analysis and holding of the majority that the evidence of the arm injury was admissible.

Regarding the motion for a mistrial, the trial court and the majority agree that the statement by the lead investigator in this case that Cook's daughter's "forensic interview, along with all the other evidence in the case, reinforced the fact that [Cook] did cause Minor's death," was inadmissible hearsay. Where I part company with my colleagues is whether the instruction given by the trial court was sufficient to remove any prejudice to the appellant.

I acknowledge that curative instructions are presumed to remove the prejudice and that mistrials should only be granted in very rare instances. *See State v. Wilson*, 389 S.C. 579, 585-86, 698 S.E.2d 862, 865 (Ct. App. 2010) ("A mistrial should only be granted when absolutely necessary, and a defendant must show both error and prejudice in order to be entitled to a mistrial."). The hotly contested evidence in this case between experts and the inference that either Cook or Father caused this child's death, made the airing of this accusatory hearsay statement by the appellant's daughter one of those rare instances. I would find the instruction was not sufficient to remove the prejudice Cook suffered and would hold the trial court erred in not granting her motion for a mistrial.

As highlighted in Cook's appellate brief, this is a classic case of "Whodunnit?". The facts presented showed Minor passed away as a result of blunt force trauma. One expert testified the injury occurred while Minor was in Cook's care, while another expert expanded the timeframe to include when Minor was with Father. Additionally, one of the experts was unable to say to a reasonable degree of

medical certainty whether Minor's injuries were intentionally inflicted by someone or accidentally incurred.  Therefore, the jury was confronted with the question as to whether Minor's injuries were inflicted by Cook, Father, or were accidental.  To add to this question, the lead investigator interjected a statement from Cook's own daughter that she believed Cook committed this crime.  Once it was clear the prosecution was attempting to produce information from the forensic interview that would be inadmissible hearsay, Cook objected.  Though the prosecution ensured it was not delving into this territory, as too often happens in criminal cases, the prosecution's next question directly resulted in the inadmissible response.  The trial court admonished the prosecution for seeking to "back-door" the daughter's interview.  The lead investigator's statement was clearly inadmissible by all legal standards because it was blatant hearsay.  To add even more prejudice to Cook, her daughter did not testify at trial and was not subject to cross-examination.

Regardless of how the majority chooses to characterize it, this case contained conflicting testimony.  Determining what the testimonies revealed or did not reveal was within the sole province of the jury to weigh and then reach a decision.  The conclusory comment by the lead investigator, however, invaded that province.  To then add a blatant hearsay statement that Cook's own daughter thought her mother caused Minor's death pushed that invasion across the Rubicon.  As Roman chronicler Suetonius observed, "Alea iacta est,"[3] and the instruction by the trial court, no matter how sincere, could not uncross that river.  In this case a mistrial, even though an extreme measure, was the only way to achieve due process. *See State v. Herring,* 387 S.C. 201, 216, 692 S.E.2d 490, 498 (2009) ("The grant of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that the prejudicial effect can be removed in no other way."); *see also State v. Nelson*, 431 S.C. 287, 312-13, 847 S.E.2d 480, 494-95 (Ct. App. 2020) (standing for the proposition that a trial court should grant a mistrial motion when a defendant is prejudiced and his due process rights are violated).  Accordingly, I would reverse and remand for a new trial.

---

[3] Gaius Suetonius Tranquillus, *De Vita Caesarum, Book I:  Divus Iulius*, Para. 32, *available at* https://penelope.uchicago.edu/Thayer/L/Roman/Texts/Suetonius/12Caesars/Julius*.html (last accessed June 23, 2023).