SHORT, J.:
**346 Tashon Earl Hurell appeals his convictions of attempted murder, armed robbery, and kidnapping, arguing the trial court erred by 1) refusing to direct verdicts, 2) admitting irrelevant testimony regarding his brother, 3) admitting irrelevant evidence regarding shoes, 4) admitting evidence of his laughter when shown a photograph, and 5) refusing to declare a mistrial. We affirm.
BACKGROUND FACTS
Mary Pecorora (the victim) testified she was working the night shift at the Kangaroo convenience store in Summerville on April 23, 2014. While in the bathroom to get supplies, she heard the store buzzer, indicating someone had entered the store. As she approached the front door, someone came around a corner, yelled at her, and hit her in the head with a bat. The perpetrator wore a mask, told her, "You gonna get it[,] *itch," and threatened to cut her throat. The victim testified the perpetrator grabbed her by the neck, dragged her to the cash register, and forced her to open it. He grabbed the money, jumped over the counter, and left. The victim described the perpetrator as approximately 5' 10? or 5' 11?, "kind of slender," and African American. She testified he was wearing a ski mask, a bandana, a hooded jacket, gloves, and red shoes. The victim called 911, and officers responded. The victim's injuries required facial and sinus surgeries.
Bernard Nelson of the Summerville Police Department testified he responded to the 911 call. Nelson took numerous photographs of the scene, including photos of a footprint on the counter. Nelson also viewed the store's video surveillance tape. Based on the victim's description and the videotape, Nelson passed a description to other police units of a "black male subject wearing a light hoodie with ... multi-colored graphic designs on the front. Bright lime green hoodie, black pants, red shoes, black gloves, dark colored bandanna over his face." Nelson also testified the suspect was of medium build, had a husky voice, and was carrying a baseball bat.
Hobie Williams, then of the Summerville Police Department, testified he was a K-9 handler on the night of the robbery. He *24 arrived at the scene and deployed his dog near the rear of the store to track the freshest human odor to be **347 found. The canine tracked to apartments near the store. There is a footpath between the locations, and it takes between thirty and ninety seconds to walk the path. Williams and another officer walked around the first building of the apartment complex and spoke to a male, who was outside on his upper level balcony. The male reported seeing a black male running from around the building carrying a baseball bat and wearing a dark tee shirt, baseball cap, and dark shorts. He also reported the man jumped the balcony beneath his, drove away in a white Mustang, returned, jumped the balcony again, and left a second time in the Mustang. The witness had never before seen the car at the apartment complex.
Williams testified he saw a dollar bill laying on the ground in the balcony area[1] of the lower unit. Although the ground was wet, the bill was dry and appeared to have blood on it. Williams testified he went into the building and made contact with the occupant of the unit in question. Hurell's sister, Tashima Jones, answered the door. Jones permitted Williams to retrieve the dollar bill from her balcony. Hurell's brother, Traquan, was also in the apartment. Williams identified the dollar bill during the trial.
Lucas Hartman testified he was the man interviewed by Williams. Hartman testified he was on his balcony at approximately 1:30 a.m. when he saw a man wearing black shorts and carrying a baseball bat and backpack approaching from behind the building across from Hartman's building. The men nodded at each other. Hartman next witnessed the man jump over the balcony beneath his balcony. Hartman heard the door open and close before the man came back out, drove away in a white Mustang, returned, and did the "same exact thing." According to Hartman, he assumed the man entered the apartment for a few minutes on each return. Hartman testified that although he was unequivocal about the make of the vehicle in his initial statement, he was not an expert on vehicles and the vehicle may not have been a Mustang. During cross-examination, he admitted he first learned the vehicle could have been a Pontiac Grand Am from Officer Williams.
**348 On re-direct examination, Hartman insisted he was never positive the vehicle was a Ford Mustang.
Michael Weaver, a detective with the Summerville Police Department, testified he was the on-call detective on April 23, 2014. Later that day, Weaver obtained a search warrant for Jones's apartment. Because no one was home when he attempted to search, Weaver obtained a key to the apartment from the apartment manager. His search resulted in a bat, a bandanna, and two pairs of red shoes, all of which were found to be irrelevant and returned to Jones. After his search and visit to the manager's office to return the key, Weaver noticed a white Pontiac Grand Am in front of the apartment. Because one of the reports had listed a white vehicle rather than a white Mustang, Weaver went back to the apartment because he believed the two vehicle makes were similar. Hurell and his mother, Jana Hurell, were there. The white vehicle was a Pontiac owned by Mrs. Hurell.
Hurell objected to any testimony of his interactions with Weaver, arguing he attempted to end the conversation with law enforcement because Hurell told Weaver, "I'm not giving you anything." During a proffer of the evidence, Weaver's report indicated Hurell walked away from him, then came back and laughed when shown a photograph of the lime green sweatshirt, saying, "[W]hy would someone wear something like this?" The trial court admitted the evidence, and Weaver testified Hurell laughed when shown the photo of the suspect wearing the sweatshirt during the robbery. Weaver claimed Hurell then asked why anyone would wear a sweatshirt like that during something like this.
Travis Holdorf testified he knew Hurell at the time of the robbery and knew Hurell's cell phone number at the time as * * *-2320. Marilyn Dilly, of Sprint as a reseller for TracFone,[2] testified as a records custodian of *25 Hurell's cell phone records for the period April 22-24, 2014. George Floyd of Verizon Wireless also testified as a records custodian, and the records for Hurell's cell phone were introduced. Floyd testified there were cell towers at 10870 Dorchester Road and at 132 Trailing Alley, both in Summerville. According to Floyd, towers in **349 rural areas such as the Summerville towers are between three and five miles apart.
Detective Weaver testified he obtained Traquan's phone records. At the time of the robbery, Traquan was on the phone from 12:21 a.m. until 2:11 a.m. He then hung up for a few moments and got back on the phone at 2:12 a.m. As to Hurell's phone, there was no activity during the time the robbery was commenced between 12:55 a.m. and 1:10 a.m. His phone was used beginning at 1:10 a.m. and pinged off the cell tower on Dorchester Road near the store. It switched to the cell tower near Hurell's mother's house, then back to the tower on Dorchester Road over an eighteen minute period. The phone was used again at 7:08 a.m. at the tower near the store. The phone then repeatedly called the telephone number for the Greyhound Bus Lines at 8:41 a.m.
The State called Shelby Bradt, the former girlfriend of Hurell's brother, Tremaine. Hurell objected, arguing her testimony would be to claim the perpetrator on the store videotape was not Tramaine, the evidence was inadmissible as lay opinion testimony, and it was irrelevant. The court overruled the objection, and Bradt testified she viewed the store videotape and the perpetrator did not look or sound like Tramaine. Bradt also testified she had never seen Tramaine wearing the green sweatshirt.
Weaver retrieved the South Carolina Department of Motor Vehicle (DMV) records for Jones's address, which indicated the residents were Jones, Hurell, and Traquan. Weaver created three six-pack photo lineups, each of which included one of the three Hurell brothers: Hurell, Traquan, and Tramaine. The victim identified Tramaine, whom she recognized as a regular customer, as having been outside the store when her shift began the night of the robbery, but she could not identify the perpetrator. Weaver also testified he reviewed the video of the robbery with the victim and neither he nor the victim thought the perpetrator sounded like Tramaine.
Tashima Jones, Hurell's sister, testified she lived in the apartment with Traquan and her son at the time of the robbery. According to Jones, Hurell alternately lived with their mother and his girlfriend. She testified she did not recognize the green sweatshirt. During direct testimony, **350 Jones was asked about Hurell listing her address as his own with the DMV. She replied, "Prior to him getting out from serving some time, ..." Hurell moved for a mistrial. After conferring with Hurell, his attorney withdrew the motion. Outside of the presence of the jury, the court questioned Hurell about the withdrawal of the motion and cautioned Jones, Tramaine, and Traquan about referring to Hurell's prior criminal activities while testifying.
Detectives Weaver and Nick Santana interviewed Hurell's brother, Traquan, at Bi-Lo, where Traquan worked. Traquan testified he was shown the video of the robbery, he did not recognize the perpetrator, and the green sweatshirt was not his. Detective Weaver was recalled and testified Traquan told him during an initial interview that the character on the sweatshirt was a Tasmanian Devil and the sweatshirt had been given to him by a friend. Santana testified he assisted during the investigation and was present when Traquan recognized the sweatshirt.
Weaver reviewed Hurell's Facebook page and saw photographs of shoes similar to those worn by the perpetrator. Derek Cheek, then of the Dorchester County Sheriff's Office, testified he reviewed the Facebook photographs in the investigatory file and noted Hurell wearing red and black shoes similar to those worn by the perpetrator in the surveillance videotape. Cheek also testified he reviewed websites of shoes, and a tread pattern in blood found at the site of the robbery was consistent with the tread pattern of red and black Nike shoes similar to those seen on the videotape. Hurell objected to the shoe evidence as irrelevant.
*26 Samuel Stewart, a DNA analyst with the South Carolina Law Enforcement Division (SLED), testified as an expert that the blood on the dollar bill found outside Jones's apartment matched the victim's blood.
The State rested. Hurell moved for directed verdicts on all charges, which the court denied. Hurell moved for a mistrial when the jury requested to review his sister's testimony again, and asked, "Did she say when he got out he sometimes stayed with her?" The jury subsequently sent a note to disregard the previous note. The court denied the motion for a mistrial. After more than four hours of deliberation, the court gave an **351 Allen[3] charge. After the jury rendered its verdicts of guilty on all three charges, Hurell renewed his motion for a mistrial and moved to set aside the verdicts. The trial court denied the motions and sentenced Hurell to three concurrent thirty year terms of imprisonment.
STANDARD OF REVIEW
The appellate court sits to review criminal cases for errors of law only and is bound by the trial court's factual findings unless they are clearly erroneous. State v. Wilson , 345 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001). Thus, on review, the appellate court is limited to determining whether the trial court abused its discretion. Id. at 6, 545 S.E.2d at 829. "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." State v. Garrett , 350 S.C. 613, 619, 567 S.E.2d 523, 526 (Ct. App. 2002) (quoting State v. Hughes , 346 S.C. 339, 342, 552 S.E.2d 35, 36 (Ct. App. 2011) ).
LAW/ANALYSIS
I. ADMISSION OF EVIDENCE
Hurell argues the trial court committed three errors in the admission of evidence. We disagree.
"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." State v. Hatcher, 392 S.C. 86, 91, 708 S.E.2d 750, 753 (2011) (quoting State v. Pagan, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006) ). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." Id.
A. Bradt's Testimony
Hurell first argues the trial court erred by allowing Shelby Bradt, the former girlfriend of Hurell's brother Tramaine, to testify the man on the videotape was not Tramaine. Hurell argues the evidence was confusing to the jury. The State argues the evidence was relevant to eliminate alternative suspects because the evidence showed the suspect went into **352 the apartment where Hurell's sister lived and anyone who also had a connection to Hurell's sister could have been a suspect.
Rule 701 of the South Carolina Rules of Evidence explains when lay witness testimony is admissible:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which (a) are rationally based on the perception of the witness, (b) are helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) do not require special knowledge, skill, experience or training.
Rule 701, SCRE. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, SCRE.
In State v. Fripp , 396 S.C. 434, 437-38, 721 S.E.2d 465, 466 (Ct. App. 2012), the State elicited the testimony of a store manager and store employee who witnessed a robbery at their store. Although the perpetrator was wearing a jacket pulled over his head, the manager identified Fripp as the perpetrator depicted on the store videotape. Id. The store employee also testified Fripp was the man on the videotape. Id. at 438, 721 S.E.2d at 466. On appeal, Fripp argued the trial court erred in permitting the witnesses to identify him as *27 the perpetrator depicted on the videotape. Id. at 438, 721 S.E.2d at 467.
This court affirmed, finding the "the criteria set forth in Rule 701 [were] met." Id. at 439, 721 S.E.2d at 467. The court first noted the testimony of the employees was based on their perceptions of Fripp "not only on the videotape, but during the time they had known and observed him in the [s]tore." Id . The manager testified she knew Fripp from seeing him in the store as often as twice a day. Id. The employee testified "she had worked at the [s]tore for several years and also knew Fripp through his family." Id. The court found the testimony was "helpful in determining a key fact in issue-whether Fripp was the person depicted on the videotape." Id.
We likewise find Bradt's testimony was properly admitted. Bradt testified she had known Hurell's brother as a boyfriend; thus, her perceptions of the videotape and opinion that the perpetrator was not the brother were rationally based. In **353 addition, her testimony was helpful in determining a key fact in issue-the identity of the perpetrator.
B. The Red and Black Shoes
Hurell next argues the trial court erred in admitting evidence regarding red and black shoes without a proper foundation and because the evidence was irrelevant. We disagree.
The perpetrator was initially described by the victims and portrayed in the videotape as wearing red shoes. Responding officer Nelson also took photographs of a footprint on the counter. Cheek testified he reviewed the case file and found a photograph from Facebook depicting Hurell wearing red and black shoes with a white mark, possibly a Nike swoosh. Because the videotape from the robbery also showed the perpetrator wearing red and black shoes, Cheek searched the internet in an attempt to match the tread pattern of the shoes allegedly worn by Hurell in the Facebook page with the tread pattern of the footprint left on the store's counter. Cheek testified the tread pattern from a red and black Nike sold on the Champs Sports website was similar to the tread pattern in the bloody footprint left at the scene. When the State attempted to introduce photographs from the website, Hurell objected, arguing no foundation had been laid and the shoes were not relevant because no shoes had been recovered. The trial court overruled the objections.
We find no error in the trial court's admission of the evidence. "The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." State v. Pagan , 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).
First, we find the State laid a proper foundation for the photographic evidence.
Whenever counsel intends to admit photographic evidence into the record, it is necessary to lay proper foundation testimony as to authentication, identification, and verification. The extent of foundation testimony required in each case is largely a function of the purpose for which the photograph is offered.
Normally, it is sufficient for the admission of photographs that a person familiar with the subject, such as a scene, **354 testify that the photographs truly represent what they purport to depict.
Alex Sanders & John S. Nichols, Trial Handbook for South Carolina Lawyers § 19:12 (Sept. 2017). Here, Cheek testified he searched the internet for photographs of shoes matching those seen in the Facebook page. He also testified he made screenshots of the photographs he obtained from the Champs Sports website. We find the State laid an adequate foundation for the admissibility of the photographs.
Second, we find the evidence was relevant. "Under Rule 401, SCRE, evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy." State v. Adams , 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003) ; see Rule 401, SCRE (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). "Although relevant, evidence may be excluded if its probative value is substantially *28 outweighed by the danger of unfair prejudice...." Rule 403, SCRE. "The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion." State v. Martucci , 380 S.C. 232, 249, 669 S.E.2d 598, 607 (Ct. App. 2008).
We find the photographs were relevant to identifying Hurell as the perpetrator. The surveillance video portrayed red and black shoes, and Hurell was portrayed wearing similar red and black shoes in a Facebook photograph. Accordingly, the trial court did not err in permitting the State to attempt to match tread marks from similar looking shoes to those found in the bloody footprint at the scene using photographs.
C. Hurell's Laughter
Hurell argues the trial court erred by allowing Detective Weaver to testify Hurell laughed when shown a photograph of the bright green sweatshirt worn by the perpetrator during the robbery because it was irrelevant and any probative value was substantially outweighed by its unduly prejudicial effect. We disagree.
**355 Hurell argued during the proffer of the evidence that Hurell's laughter was not relevant and was extremely prejudicial because it "attempt[ed] to paint him as cold-hearted or villainous." The court stated, "Hurell made apparently, I thought, a humorous comment.... Who would wear something like that to do something like that ... or something to that inclination." In ruling the testimony was admissible, the court found, "My take on that is not the same take that you're taking out from it. ... [T]o me, it seems to me someone who doesn't have to worry about it. Not someone who's being callously indifferent."
Hurell argues the evidence was "gratuitous bad character evidence" that was not relevant and indicated he was the type of person who would commit such a crime. Propensity evidence is not admissible to prove a defendant has the inclination or propensity to commit the crime with which he is charged. State v. Nelson, 331 S.C. 1, 6, 501 S.E.2d 716, 719 (1998). We agree with the trial court that this evidence did not unfairly suggest Hurell had the propensity to commit the crimes charged. Thus, we find no error in its admission. See State v. Oglesby, 384 S.C. 289, 293, 681 S.E.2d 620, 622 (Ct. App. 2009) ("The admission of evidence is within the sound discretion of the trial court.").
II. DIRECTED VERDICTS
Hurell argues the trial court erred by refusing to direct verdicts on all three counts where the State's circumstantial evidence raised only a suspicion of guilt, and the trial court incorrectly reasoned the directed verdict standard had changed. We disagree.
In deliberating on Hurell's motions for directed verdicts, the trial court stated it "must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt." The court went on to review the circumstantial evidence of guilt and concluded, "a reasonable juror could believe ever[y] step in the chain." Thus, it denied the motions.
"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight."
**356 State v. Weston , 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." State v. Brannon , 388 S.C. 498, 501, 697 S.E.2d 593, 595 (2010). "[A] court is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." State v. Bennett , 415 S.C. 232, 236, 781 S.E.2d 352, 354 (2016). "On appeal from the denial of a directed verdict, [the appellate court] must view the evidence in the light most favorable to the State." State v. Odems , 395 S.C. 582, 586, 720 S.E.2d 48, 50 (2011). "[I]f there is any direct or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury." Id.
We find no error by the trial court in reviewing the motion for a directed verdict or in its application of the directed verdict standard. First, there was circumstantial evidence the perpetrator went from the store to the apartment and was the same person seen *29 carrying a baseball bat and entering Hurell's sister's apartment. There was also evidence the perpetrator was known to Hurell's sister because the bloody dollar bill matching the victim's DNA was found on her porch. In addition, there was evidence Hurell's brother owned a sweatshirt similar to the distinctive one worn by the perpetrator. There was also circumstantial evidence the perpetrator used Hurell's mother's vehicle. Next, there was evidence Hurell's cell phone was used in the area near the time of the incident and was used to call the Greyhound Bus Lines numerous times later that morning. Finally, there was a Facebook photograph indicating Hurell owned shoes similar to those seen being worn by the perpetrator in the video. We find substantial circumstantial evidence existed.
We also find the trial court applied the correct standard in reviewing the motions. It is not the trial court's function to weigh the evidence; rather, it must view the evidence in the light most favorable to the State and submit the case to the jury if there is substantial circumstantial evidence which reasonably tends to prove the guilt of the accused. Bennett , 415 S.C. at 236-37, 781 S.E.2d at 354. We find the evidence presented was sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt. See id . at 237, 781 S.E.2d at 354 ("[I]n ruling on a directed verdict motion **357 where the State relies on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt.").
III. MISTRIAL
Hurell argues the trial court erred by refusing to declare a mistrial after Hurell's sister inadvertently told the jury he had been in prison as the result of a prior conviction. We disagree.
At the time of the reference to Hurell's prior prison time, Hurell's counsel moved for a mistrial. After consultation with Hurell, the motion was withdrawn. Outside of the presence of the jury, the court cautioned all of Hurell's relatives not to comment on whether Hurell had ever served time in jail or been charged with any type of criminal offense.
During jury deliberations, the jury sent two notes to the trial court. The first note requested to review the sister's testimony, asking, "Did she say when he got out he sometimes stayed with her?" The second note stated, "[P]lease disregard the last request." Hurell's counsel argued, "I think it's telling, that's the part they want to know about. Because they've got when he got out in parenthes[e]s. ... Clearly, this is a topic of conversation within the jury room." Hurell moved for a mistrial.
The trial court found the first note "was a concern to the [c]ourt and had that been a question the [c]ourt was going to have to resolve, I would have reconsidered your motion for a mistrial. But since [the jury] immediately came back and said, please disregard it, I am taking the position that [it was] disregarding that question as well.... Based upon that interpretation of the questions by the jury, I am going to deny your motion for [a] mistrial."
"The decision to grant or deny a motion for a mistrial is a matter within a trial court's sound discretion, and such a decision will not be disturbed on appeal absent an abuse of discretion amounting to an error of law." State v. Council , 335 S.C. 1, 12, 515 S.E.2d 508, 514 (1999). "A mistrial should not be granted unless absolutely necessary." Id. at 13, 515 S.E.2d at 514. "In order to receive a mistrial, the defendant **358 must show error and resulting prejudice." Id. We find no abuse of discretion by the trial court. Further, we find Hurell has not shown prejudice. See State v. Thompson , 352 S.C. 552, 561, 575 S.E.2d 77, 82 (Ct. App. 2003) ("[A] vague reference to a defendant's prior criminal record is not sufficient to justify a mistrial where there is no attempt by the State to introduce evidence that the accused has been convicted of other crimes."); State v. Manning , 400 S.C. 257, 270, 734 S.E.2d 314, 320 (Ct. App. 2012) (holding a single reference to a severed charge did not constitute sufficient prejudice to warrant a mistrial).
AFFIRMED.
THOMAS and HILL, JJ., concur.

The balcony is also described in the record as a breezeway. The photographic exhibit depicts a porch area on the ground level apartment, enclosed with a waist-high railing.

Dilly testified TracFone is a reseller of Sprint, sells prepaid phones, and keeps its own records.

Allen v. United States , 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (discussing the jury charge given by a trial judge to encourage a deadlocked jury to reach a verdict).